AMINOIL USA, INC.

v.

OKC CORPORATION.

Civ. A. No. 81–1169.

United States District Court,
E.D. Louisiana.

March 5, 1986.

Kennedy J. Gilly, Jr. & Charles D. Marshall, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for plaintiff.

Gene W. Lafiette, John W. Wilson, Liskow & Lewis, New Orleans, La., for defendant.

## FINDINGS AND CONCLUSIONS

LIVAUDAIS, District Judge.

In May, 1980, defendant, OKC Corp., entered into a liquidation of its assets and its interest in the subject matter of this lawsuit was transferred to OKC Limited Partnership. The parties have stipulated that any judgment rendered regarding OKC Corp. applies equally to OKC Limited Partnership, and both entities are collectively hereinafter referred to as "OKC."

Plaintiff, Aminoil USA, Inc. has changed its name to Aminoil, Inc. and thereafter merged with Phillips Oil Company, which subsequently merged with Phillips Petroleum Company. Plaintiff will be referred to herein as "Aminoil."

By letter agreement dated May 9, 1977, (the "farmout") Aminoil farmed out to OKC Aminoil's ¼ interest in a mineral lease granted by the United States, as lessor, covering South Pass Block 89 (OCS-G-1618) on the Outer Continental Shelf, offshore Louisiana. (Joint Exhibit A). Under this farmout, Aminoil retained an overriding royalty interest in production subject to the condition that when South Pass Block 89 reached a "net profits" status—in general terms, when the income from this mineral property exceeded the costs and expenses of exploration and production—the overriding royalty interest of Aminoil would convert to a very substantially greater "net profits" interest.

A dispute arose between the parties as to whether Aminoil's retained overriding royalty interest and net profits interest in production related to all production from the above-mentioned lease, as Aminoil contended, or whether it related only to Production of reserves discovered prior to the time the farmout was executed, to be produced only from Platform A located in the northern portion of the lease block, as OKC contended. Aminoil instituted this civil action seeking declaratory judgment as to its ownership of an overriding royalty interest and net profits interest and moved for partial summary judgment decreeing that the farmout is clear and unambiguous and provides that Aminoil's retained interest is applicable to production from the entirety of South Pass Block 89, and not merely, as OKC contended, to the production from the northern portion of the block. By minute entry dated July 27, 1984, the Court granted Aminoil's motion, and also granted Aminoil's separate motion *in limine* to exclude parol evidence offered by OKC for purposes of interpretation and/or reformation of the farmout. The Court further ordered that OKC render an accounting to Aminoil for all proceeds of production attributable to Aminoil's overriding royalty interest and

net profits interest in accordance with the Court's construction of the farmout. (Record Documents 274–276).

OKC's accounting was served upon Aminoil (OKC Exhibit D–1), and thereafter Aminoil served exceptions to this accounting, taking issue with one of the credits and several of the charge items contained in the accounting. (Aminoil Exhibit P–1).

The Court appointed Julian P. Brignac as an expert witness under the provisions of Fed.R.Evid. 706. On August 23, 1985, Mr. Brignac submitted his written report. Thereafter, his deposition was taken in connection with this matter and was offered at the trial by Joint Stipulation of the parties as Aminoil Exhibit P–3, subject to objection by OKC as to certain portions of his testimony. (Joint Stipulation, para. 9).

The parties have amicably resolved all issues under the OKC accounting except two charges made by OKC to the net profits account: (a) OKC's $29,966,096 interest charge; and (b) OKC's $514,728 charge for legal expenses incurred in connection with this litigation. OKC contends it is entitled under the farmout to recoup these amounts from production from the lease before Aminoil's overriding royalty converts to the substantially greater net profits interest. Aminoil argues to the contrary.

In its original accounting, OKC charged to the net profits account the sum of $29,-966,096 as interest on funds spent by OKC in developing the lease after the farmout based on the cost of funds to OKC. (OKC Exhibit D–1). To reflect the adjustments made to the accounting as a result of the stipulation of the parties, this interest amount, through June 30, 1984, has also been adjusted and now is calculated to be $29,666,997. (Joint Stipulation, para. 6).

Of the amount of $29,666,997 in interest which OKC claims is chargeable against the Net Profits Account, $7,900,000 was actually incurred for capital borrowed by OKC and attributable to costs of exploratory and developmental operations on, and production of minerals from, South Pass Block 89 under OCS–G–1618. The remainder of the total interest figure, $21,766,997, is imputed interest, or the time value of money utilized by OKC to participate in the operations on and production of minerals from OCS–G–1618, calculated at the rates and by the methodology reflected in the Net Profits Accounting. (OKC Exhibit D–1, Joint Stipulation, para. 6). Aminoil does not dispute the method of calculation of the "imputed" interest and has stipulated the correctness of the amount of interest actually incurred by OKC. (Joint Stipulation, para. 6).

Additionally, in its accounting, OKC charged expenses incurred by it in connection with the instant litigation against the net profits account. OKC, thus, seeks to charge against the net profits account the sum of $484,529,[1] representing legal expenses incurred in this litigation, the sum of $18,185, representing fees paid to Core Laboratories for consulting work done in connection with this litigation, and $42,272, representing payments made by OKC to potential expert witnesses retained in connection with this ligitation.[2] The parties have stipulated that these several items should be treated together as expenses of litigation. (Joint Stipulation, para. 8).

■ Trial proceeded to resolve the two remaining issues before the Court, namely:

1) Did OKC improperly charge its legal expenses arising out of this lawsuit to its net profits account?

---

1. OKC's charge against the account representing legal expenses has been reduced by $30,199 since such amount represented one invoice that was inadvertently charged twice to the account by OKC.

2. These expert witness fees were initially placed by OKC in the general and administrative expense category. The Aminoil exception disal-

lowed $42,682 citing "coding errors." OKC then reviewed the pertinent invoices and determined that $42,274 of this amount represented payments made to expert witnesses. The parties have stipulated that this amount should be included in the litigation expense category. (Joint Stipulation, para. 8).

2) Did OKC improperly charge real and imputed interest to its net profits account?

Both sides concede that these issues must be resolved by application of the net profits accounting provisions of the farmout, which are controlling.

Paragraph IV(c) on page 3 of the farmout requires OKC to maintain a net profits account for the purposes of determining when net profits is achieved:

"OKC shall *maintain a net profits account in accordance with the terms of this agreement and good accounting practices;* ..." (Emphasis added)

OKC prepared a net profits accounting and submitted it together with a letter from Coopers & Lybrand, certified public accountants. (OKC Exhibit D-4). The letter is merely a confirmation of OKC's arithmetic and specifically states that the procedures undertaken by Coopers & Lybrand "do not constitute an examination made in accordance with general accepted auditing standards ..." (OKC Exhibit D-4 at p. 6).

Aminoil retained the services of Price Waterhouse, certified public accountants, to review the farmout, examine OKC's net profits accounting and the underlying documents and prepare a report in accordance with the net profits accounting provisions of the farmout. This report, (Aminoil Exhibit P-1), prepared by Price Waterhouse and, as required by paragraph IV(c) of the farmout, specifically notes the application of accepted accounting practices in the oil and gas industry:

"However, we believe that the table column entitled 'Net Profits Accounting, as Adjusted' reflects the Net Profits Accounting in accordance with the provisions of the farmout agreement and with generally accepted accounting practices in the oil and gas industry."

In aid of its resolution of the exceptions taken by Price Waterhouse to OKC's Net Profits Accounting, this Court appointed Mr. Julian P. Brignac as its own independent expert. Mr. Brignac is an attorney and a certified public accountant and retired in 1982 after many years as a partner with the accounting firm of Peat Marwick Mitchell & Co. He is now special counsel to the law firm of Jones, Walker, Waechter, Poitevent, Carrere & Denegre. For almost 40 years, Mr. Brignac has been employed in the tax and accounting areas and is familiar and experienced with accounting procedures and principles. He testified in his deposition at length concerning his expertise. (Brignac deposition, Aminoil Exhibit P-3, pp. 5-35, 92-93). His report was submitted to the Court. (Aminoil Exhibit P-2). As regards the two matters in dispute, Mr. Brignac is in agreement with Price Waterhouse.

The net profits accounting provisions contained in this farmout agreement have a specialized usage and meaning within the oil and gas accounting field. Obviously, expert accounting testimony was required to explain the accounting interpretation of the net profit accounting provisions at issue. OKC argues that such is improper and objects based on the parol evidence rule that this testimony seeks to elicit extrinsic evidence with respect to an unambiguous contract. This argument and objection are misplaced. In its submission to the Court's expert, Julian P. Brignac, entitled "Defendant's Statement of the Case and Definition of Issues" OKC stated:

"It is defendant's position, therefore, that the court-appointed expert witness should review and analyze the May 9 letter in light of generally accepted accounting and auditing principals [sic] in the oil and gas industry to prepare himself to present his expert opinion regarding the propriety of the categories of charges enumerated above and the proper account of said charges at the hearing before the Court on the accounting issues."

(Aminoil Exhibit P-3, Brignac deposition, attachments).

 The farmout agreement treats at great length the manner in which net profits are to be calculated. (Joint Exhibit A at pp. 3-7). Interest, actual or imputed, is not

addressed. On the other hand, taxes and insurance premiums, together with various other items are specifically addressed as charges. Obviously, the parties were aware of the certainty of taxes and insurance premiums and, accordingly, addressed them. They chose not to include the equally obvious interest, actual and imputed, which would result from the operation, as charges.

Paragraph IV(e)(1) of the farmout provides that against the net profits account shall be charged the following:

[A]n amount equal to the costs to OKC of all direct labor (excluding fringe benefits), transportation, and other services necessary for exploring, developing, equipping, operating and maintaining the subject lease; and of all material, equipment, and supplies purchased by OKC and used on the subject lease; and of any amounts charged to OKC in connection with the creation of any unit or units in which the subject lease is or may be included; and of that portion of any other amounts paid to any operator.

OKC argues that under the generally prevailing meaning of the word "cost," the interest deduction sought here by OKC represents a part of the "cost" to OKC of "labor, ... transportation, and other services necessary for exploring, developing, equipping, operating and maintaining the ... lease" and of "all material, equipment, and supplies purchased by OKC." That is, the interest cost to OKC represents "[t]hat which is sacrificed" by OKC to realize a benefit: participation in production from the lease for both OKC and Aminoil.

At the trial of this matter Aminoil called Price Waterhouse partners William Powell and Ronald Bannister to testify. By stipulation Julian P. Brignac's testimony was presented through his deposition. Both Mr. Powell and Mr. Bannister testified as to their accounting experience in general and in particular their extensive oil and gas accounting experience. Both men have performed a tremendous amount of audit and accounting work involving various types of oil and gas contracts such as leases, assignments and farmouts. Many of these contracts contained net profits accounting provisions or payout accounting provisions, similar to this farmout, where one party is allowed to recover specified expenses prior to another party's succeeding to a greater interest. Specifically, this work included checking the propriety of costs and other charges made to net profits or payout under the accounting provisions of the agreement involved. Both Mr. Powell and Mr. Bannister were accepted by the Court as experts in oil and gas accounting without challenge by OKC. Whereas both Mr. Powell and Mr. Bannister stated that any agreement which would allow the interest charge would not violate sound accounting principles, it is the accounting procedure set forth in the net profits accounting provisions which defines the contractual agreement between Aminoil and OKC as to what costs can be properly charged by OKC to the net profits account. This is an accepted practice in the oil and gas industry and these net profits accounting provisions have a specialized and technical meaning and usage within the oil and gas accounting profession and must be interpreted according to their accepted usage. Both Mr. Powell and Mr. Bannister testified unequivocally that interest which OKC charged to the net profits account was improper, whether it be actual or imputed.

Each stated that the net profits accounting provisions in this farmout, as with similar accounting provisions, are consistently interpreted to exclude interest unless interest is specifically designated as a chargeable item. Mr. Powell testified:

"Q. All right. Let's go to the interest item, noted as exception 7 of your report.

Can you explain for us why you decided that interest was not chargeable to the net profits account, or why Price Waterhouse decided that?

A. Yes, sir. It was my conclusion, based upon the reading of the Farmout Agreement; based upon my cumulative knowledge within the oil and gas industry; based upon consultation with Mr. Bannister, the lead partner on the en-

gagement; based upon conversations with Mr. Keith Claver of our Houston office of Price Waterhouse, the lead accountant and auditing specialist in the oil and gas industry; and based on a reading of numerous, numerous textbooks from Professional Development Institute, Copus—C–O–P–U–S—Bulletin No. 9, FASB 1925 and FASB 19, 25 and 69, it was our firm's conclusion that interest was not allowable under this agreement." (Tr. 41–42).

and:

"Q. And was it just Mr. Claver that you talked to among your partners, or did you talk to other partners at Price Waterhouse?

A. I talked to more than Mr. Claver. As part of the process, I discussed the principles of the inclusion of interest in a farmout arrangement and a payout calculation with several partners and managers in the Dallas office, who participate in the oil and gas industry, and who are also considered experts in the oil and gas industry by our firm, and they were all unanimous that unless interest was specifically mentioned in the farmout agreement, then interest was not an includable or not allowable as a charge to the agreement.

I, also, during a meeting of our petroleum industry services group, a group of over 25 partners and managers with special expertise in clients in the oil and gas industry, again I raised the question of, or the principle of, including interest—

I discussed the principle of including interest in a net profits or payout calculation where it was excluded from the language of the farmout or payout agreement, and it was again unanimous that they would not, or had not seen interest ever included where it was silent in that farmout agreement." (Tr. 42–43).

Mr. Bannister noted the crucial absence of any method for determining how interest would be calculated and charged, and stated:

"Q. Would you please continue, sir?

A. I believe that the contract would have had some rather extensive discussion of the concept of interest charges, including some rather detailed specifics, as to the methodology of some computations, the rates to be used; the basis upon which the rates to be determined, whether tied to incremental borrowing rates of the operator or the T-bill rates, or whatever—T-bill, Treasury Bill rates—and the methodology as to how those rates were to be applied to a base. In other words, the computation I think would have been dealt with in the document.

Failing to see such a provision and failing to see any other language which would, in this farmout agreement, I have—I cannot conclude that the parties intended for interest to be included in the calculation.

Q. And that's based on your review of the terms of the accounting provisions, in light of the accepted practices, accounting practices in the oil and gas industry?

A. Yes.

Q. And when you say you can't conclude the intent was such, the only measure you have of their intent is the document itself?

A. That is correct. I might say that I am not aware—I have asked—whether there have been any supplemental agreements or correspondence on this point between the parties, which would effectively serve as an amendment to the agreement, or a supplement to the agreement, and I have been told it has not been dealt with; that the agreement stands on its own feet and speaks for itself.

Q. Is there any reference in the accounting provisions of this agreement at all to interest, in any respect whatsoever?

A. I see none." (Tr. 87–88).

■ With regard to the issue of legal expenses, the farmout, Paragraph IV(e)(2), provides that against the net profits account shall be charged the following:

[a]n amount equal to the expenses of litigation, liens, judgments and liquidated liabilities and claims incurred and paid by OKC on account of its ownership interest in the subject lease, or incident to the development, exploration, operation, or maintenance thereof.

OKC argues that the plain language of this provision allows OKC to charge against the account the expenses of litigation incurred by OKC "on account of its ownership interest in the subject lease" and that the instant litigation brought by Aminoil against OKC results from OKC's ownership interest in the lease.

Both Mr. Powell and Mr. Bannister elaborated on Price Waterhouse's exception to OKC's attempt to charge legal expenses related to this lawsuit under paragraph IV(e)(2). Both testified unequivocally that such accounting language, under accepted accounting practices in the oil and gas industry, never includes legal expenses related to a dispute between the contracting parties. Mr. Powell testified:

"Q. Since the only points which OKC is now contesting in this report on the merits are legal expenses and interest fees, let's go straight to legal expenses, and would you tell me why Price Waterhouse has disallowed OKC's legal expenses related to this lawsuit that we are involved in today?

A. Yes, sir. Based on my reading of the Farmout Agreement, based on my experience within the industry, Mr. Bannister's experience within the industry, our consultation with leading audit and accounting specialists within the oil and gas industry, it was our conclusion that legal expenses between the two parties of this agreement, Aminoil and OKC would not be includable in this farmout agreement. This farmout agreement would relate, or these legal paragraphs in the agreement, Paragraph IV(e)(2) would relate to litigation with respect— or legal fees incurred with respect to protecting the title of the property, some damages incurred, barges running into the platform, any personal injury suit, somebody get hurt on the platform, something of that nature; but certainly, not between the two parties to the agreement." (Tr. 36).

Mr. Powell's opinion was echoed by Mr. Bannister:

"Q. And it was your conclusion that legal expenses arising out of this lawsuit between Aminoil and OKC were not chargeable to the net profits account as a legal expense?

A. That was and is my conclusion, yes.

And I reached that conclusion on the basis of my reading of the various provisions in the agreement, including but not limited to the subparagraph (4), which deals with—I'm sorry—it's IV(e)(2), which deals with the definition of types of charges which can be made to the net profits account with respect to litigation, liens, judgments, claims and the like.

Q. Well, based on your expert opinion and experience, what type of legal expenses would be chargeable under that provision?

A. In my judgment, this paragraph refers to matters that OKC would encounter in connection with the defense of its title to the property with the normal pursuit of the business, that is, the development and exploration and operation and maintenance of the property, as it relates to outsiders, if you please.

Q. Well, if for example, a worker slips on a platform and injures himself, and sues OKC and other operators, that would be the type of expenses chargable?

A. Yes, that would be exactly what I had in mind, as well as situations such as, I believe Mr. Powell referred to the possibility of a marine collision, which might lead to litigation surrounding damages, and so forth.

Q. Yes, sir."

"Q. During your career of almost forty years in the accounting field, have you seen legal fees, accounting provisions, similar to the one in this farmout?

A. Yes, I have.

Q. Is the one in this farmout typical of the others you have seen?

A. Yes, quite similar.

Q. Do you know of any occasion in your experience where you or anyone else treated such language as including legal expenses arising from a dispute between the parties to the agreement?

A. No, sir, I have not." (Tr. 83–84).

The expert appointed by the Court, Mr. Julian P. Brignac, conducted exhaustive research into the issues at hand. Although Mr. Brignac did not appear in person at trial, his August 23, 1984 report to this Court and his deposition testimony, both of which were introduced into evidence at the trial, fully support the testimony and evidence presented by the Price Waterhouse witnesses as to both legal expenses and interest. (Aminoil Exhibit P–3, Brignac dep., Tr. 73, 75–76, 80–88).

OKC produced no testimony or evidence at the trial in support of its net profits accounting or any evidence in contravention of the testimony of the Price Waterhouse witnesses or Julian P. Brignac. OKC has objected to all expert testimony by arguing that these expert accountants should not be allowed to "interpret" the net profits accounting provisions of the farmout. OKC's entire case then rests on its objection to any expert accounting testimony regarding the net profits accounting provisions. Clearly OKC's objection to all expert accounting testimony in this case is improper. The unchallenged expert testimony of three expert accounting witnesses that the net profits accounting provisions of this farmout do not permit OKC to charge legal expenses arising out of this lawsuit or interest is persuasive and is accepted. These experts are interpreting these net profits accounting provisions, but it is their accounting interpretation based on their training and experience, which they are explaining in aid of this Court's legal determination of the issue of whether OKC has improperly charged such legal expenses and interest. They have not testified violative of the parol evidence rule. Neither Aminoil nor OKC contend that the farmout is ambiguous. The Louisiana Civil Code, L.S.A.—C.C. art. 2047 is controlling. It provides:

"The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter."

Further, Rule 702, Federal Rules of Evidence supports the Court's rejection of OKC's objections at trial. It provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The evidence does not vary or contradict the net profits accounting provisions. It explains them.

The evidence introduced into the record at the trial of this matter clearly established that the net profit accounting provisions of the farmout prohibit OKC's attempt to charge legal expenses related to this lawsuit and interest to the net profits account.

In view of the Court's resolution of the foregoing issues, all costs of these proceedings, including all costs of the Court-appointed expert, Mr. Julian P. Brignac, are taxed against OKC.

The Court directs that the parties attempt to draft a form of judgment acceptable to each of them in conformity with the Court's rulings herein. Should they be unable to agree each side is to submit a proposed form of judgment.