**PLACID OIL COMPANY, Appellant,**

v.

**LOUISIANA GAS INTRASTATE,
INC., Appellee.**

No. 05–85–01045–CV.

Court of Appeals of Texas,
Dallas.

Feb. 19, 1987.
Rehearing Denied April 10, 1987.

Michael V. Powell, Dallas, Thomas J. Wyatt, Shreveport, La., for appellant.

William B. Chaney, Dallas, for appellee.

Before McCLUNG, SCALES[1] and HOLLINGSWORTH[2], JJ.

[1] The Honorable R.T. Scales, Justice, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

[2] The Honorable Cynthia Hollingsworth, Justice, did not participate in this decision because her term expired prior to the issuance of this opinion.

**2**

SCALES, Justice.

Placid Oil Company ("Placid") sued Louisiana Gas Intrastate, Inc. of Shreveport ("LGI") for breach of a gas sales contract, claiming that LGI had underpaid for gas sold under the contract. LGI counterclaimed, seeking declaratory relief and attorney's fees. The trial court rendered judgment for LGI on its counterclaims and rendered a take-nothing judgment against Placid based upon *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). In six points of error, Placid contends that the trial court erred: 1) in concluding that *Energy Reserves* is dispositive of Placid's claim for recovery of a higher price for gas sold to LGI; 2) by not applying Louisiana law to interpret a price escalation clause in the contract; 3) in concluding that the price escalation clause is insufficient to trigger higher federal prices; 4) in rendering judgment for LGI against the great weight and preponderance of the evidence; 5) in interpreting the contract based upon extrinsic evidence of the parties' intent without finding that the contract is ambiguous; and 6) in abusing its discretion by awarding attorney's fees to LGI. We overrule all points of error and affirm.

This lawsuit arose out of a contract for the sale of natural gas executed on March 15, 1978, by Bodcaw Company ("Bodcaw"), as producer and seller, and LGI, an intrastate gas pipeline company, as buyer. The gas purchased by LGI was to be transported through LGI's pipelines to markets within Louisiana. The contract covers production from several tracts of Louisiana land in which Bodcaw owned an interest in the minerals. On October 11, 1979, Bodcaw assigned some of the oil and gas leases covered by the contract to Placid. The assignment expressly conveys to Placid "all contracts and agreements (including operating agreements) relating to or affecting the production of oil and gas [from the identified leases] or from other lands or leases unitized therewith."

The contract contains three pricing provisions. Paragraph 5.1 of Article V specifies a price per thousand cubic feet of gas sold for each of the first five years of the contract. Paragraph 6.1 of Article VI provides for price redetermination, upon the seller's written notification to the Buyer, to an agreed amount or to an amount equal to the average of the three highest gas prices in the area. The third pricing provision, paragraph 5.6 of Article V, is a governmental price escalator clause which states:

5.6 *FERC Price Protection:* If the Federal government or any agency thereof or any governmental authority having jurisdiction in the premises, shall prescribe or approve for the area of onshore Louisiana North of the thirty first (31st) parallel, a just and reasonable Area or National Ceiling Rate, Settlement Rate, or any other rate for this vintage Gas or category of Gas, which is higher than the applicable price set forth under the other provisions of this Article, then the applicable price otherwise provided for in this Article shall be increased to an amount equal to such higher FERC rate and said higher rate shall remain in effect unless and until the rate stipulated in the price schedule of Paragraph 5.1 or the price redetermined pursuant to the provisions of Article VI shall be higher. In the event any part of the higher rate permitted by the FERC is subject to refund, with interest, and the FERC subsequently requires such refund, then Producer shall make refund to Buyer on the same basis as that required by the FERC, provided such refund shall not reduce the price hereunder below that provided by the other provisions of this Article. Buyer shall increase the price otherwise payable to Producer for Gas delivered hereunder as of the effective date of the order.

On November 9, 1978, Congress enacted the Natural Gas Policy Act of 1978 ("NGPA"). *See* 15 U.S.C. §§ 3301–3432 (1982). Section 105(b) of the NGPA estab-

lishes a price ceiling for intrastate gas that is subject to a sales contract existing on November 8, 1978. *See id.* § 3315(b). Section 105(b) provides:

**(b) Maximum lawful price—**

(1) **General rule.—** ... the maximum lawful price under this section shall be the lower of—

(A) the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date; or

(B) the maximum lawful price, per million Btu's, computed for such month under [section 102] of this title (relating to new natural gas).

*Id.*

From December 1, 1978, the effective date of the NGPA, to February 28, 1983, when LGI lawfully terminated the contract, LGI paid for gas purchased under the contract on the basis of the prices set forth in paragraph 5.1 or the price as redetermined pursuant to paragraph 6.1. Shortly after LGI terminated the contract, Placid sued LGI for breach of contract alleging that LGI had underpaid for gas purchased between December 1, 1978 and February 28, 1983.

Placid argues that the enactment of NGPA section 105(b) triggered the price escalation mechanism in paragraph 5.6. Placid maintains that under paragraph 5.6, the contract price immediately and automatically escalated to the NGPA section 102 price. Consequently, Placid contends that beginning December 1, 1978, LGI's payments for gas purchased should have been based on the higher section 102 price, rather than the lower price as determined under paragraph 5.1 or paragraph 6.1 of the contract. We must determine what effect, if any, the enactment of NGPA section 105(b) had on the price of gas sold to LGI under the contract.

Placid contends, in three points of error, that *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), is not dispositive of Placid's claim of entitlement to section 102 prices, and that paragraph 5.6 is a sufficient mechanism to escalate the contract price to section 102 price levels under applicable Louisiana law. In *Energy Reserves*, the United States Supreme Court rejected a claim that a price escalation clause in an intrastate gas contract caused the contract price to increase to section 102 price levels when the NGPA was enacted. The Court held that "as a matter of federal statutory interpretation, the [NGPA] does not trigger such clauses automatically." *Energy Reserve*, 459 U.S. at 420, 103 S.Ct. at 709. Rather, the Court deferred to state law and held that the applicable state law should be used to interpret each particular escalator clause. *Id.* at 421, 103 S.Ct. at 709.

■ Placid contends that Louisiana law should be used to interpret paragraph 5.6 of the contract. We agree. The contract expressly provides that Louisiana law will govern the agreement. Contractual choice-of-law provisions are honored by Texas courts. *See Budge v. Post*, 643 F.2d 372, 374 n. 1 (5th Cir.1981); *see also Austin Bldg. Co. v. Nat'l Union Fire Ins. Co.*, 432 S.W.2d 697, 701 (Tex.1968) (parties' intent determines applicable state law).

■ Under Louisiana law, contract interpretation requires a determination of the common intent of the parties. *See* LA.CIV. CODE ANN. art. 2045 (West Supp.1987). The intent of the parties is to be determined by the words of the contract when the words are clear and explicit and lead to no absurd consequences. *See Leenerts Farms, Inc. v. Rogers*, 421 So.2d 216, 218 (La.1982); *see also* LA.CIV.CODE ANN. art. 2046 (West Supp.1987) (where words of contract are clear, no further interpretation may be made in search of the intent of the parties). The words of a contract must be accorded their common or generally prevailing meaning. *See* LA.CIV.CODE ANN. art. 2047 (West Supp.1987); *Lambert v. Maryland Casualty Co.*, 418 So.2d 553, 559 (La.1982). However, technical words or words having a special meaning within a particular industry are to be accorded their technical or special meaning. *See* LA.CIV.CODE ANN. art. 2047 (West Supp.1987); *Van Geffen v. Herbert*, 439

So.2d 1257, 1259 (La.Ct.App.1983). With these principles in mind, we examine the language of paragraph 5.6 of the contract.

Paragraph 5.6 provides that if a federal agency "shall prescribe or approve ... a just and reasonable Area or National Ceiling Rate, Settlement Rate, or any other rate for *this vintage Gas or category of Gas*, which is *higher* than the applicable price set forth under the other provisions of this Article," then the contract price is increased to the higher federal rate. "[T]his article" refers to Article V of the contract, and the only other pricing provision in Article V is paragraph 5.1. Thus, the price escalation mechanism in paragraph 5.6 is triggered *if* a federal agency prescribes or approves, for this vintage or category of gas, a just and reasonable area or national:

1) ceiling price;
2) settlement price; or
3) any other price,

which is *higher* than the price established under paragraph 5.1.

In determining whether paragraph 5.6 was triggered by the enactment of the NGPA, we are confronted, initially, with the meaning of the phrase "this vintage Gas or category of Gas." The word "this" necessarily refers to the gas that is subject to the contract. Therefore, we must determine the exact federal vintage or category for the gas that is subject to the contract.

"Vintage" and "category" are words that have special meanings within the federal regulatory scheme for gas. Accordingly, we interpret paragraph 5.6 in light of the settled meanings for those words within the gas industry. *See Aminoil USA, Inc. v. OKC Corp.*, 629 F.Supp. 647, 653–54 (E.D.La.1986) (technical accounting language in oil and gas farmout agreement interpreted in light of accepted meaning within the oil and gas industry). The NGPA creates several "categories" of gas for pricing purposes. *See Amoco Prod. Co. v. Western Slope Gas Co.*, 754 F.2d 303, 305 n. 3 (10th Cir.1985); *Bowers v. Phillips Petroleum Co.*, 692 F.2d 1015, 1019 n. 5 (5th Cir.1982) (listing the categories). There is only one federal "category" encompassing the gas subject to this contract—intrastate gas subject to a contract existing on November 8, 1978 (section 105(a) gas). The word "vintage" is a timing concept which refers to either the date on which a gas contract was executed (contract vintaging) or the date on which the well producing the gas was completed (well vintaging). *See Amoco Prod. Co. v. Delhi Gas Pipeline Corp.*, 674 S.W.2d 469, 470 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). With respect to intrastate gas and the NGPA regulatory scheme, the concept of "vintaging" is encompassed within the price "category" for intrastate gas. *See* 42 U.S.C. § 3315(a) (1982) (categorizing intrastate gas *subject to a contract existing on November 8, 1978*) (emphasis added). Therefore, within the NGPA regulatory scheme for intrastate gas subject to existing contracts, "vintage" has no meaning independent from the word "category." Thus, whether paragraph 5.6 was triggered depends upon whether Congress, through the NGPA, "prescribed or approved" either a settlement rate, ceiling rate, or any other rate for section 105(a) gas that is higher than the price provided for in paragraph 5.1 of the contract.

■ Federal pricing for section 105(a) gas is governed by section 105(b) of the NGPA. Congress did not, in section 105(b), "prescribe" a rate for section 105(a) gas. *Energy Reserves Group, Inc.*, 459 U.S. at 421, 103 S.Ct. at 709. Nor did Congress "approve" a rate for section 105(a) gas. *Cf. City of Farmington v. Amoco Gas Co.*, 777 F.2d 554, 564 (10th Cir.1985) (rejecting a similar argument based on the word "allow" in an intrastate gas contract). Rather, through section 105(b), "Congress set a ceiling for the operation of contractual [pricing] provisions." *Energy Reserve Group, Inc.*, 459 U.S. at 421, 103 S.Ct. at 709. Therefore, within the meaning of paragraph 5.6, we hold that Congress did "prescribe or approve" a national ceiling rate for the gas that is subject to the contract when it enacted section 105(b).

Section 105(b) provides:

(b) Maximum lawful price—

(1) General rule.— ... the maximum lawful price under this section shall be the *lower* of—

(A) the price under the terms of the existing contract, to which such natural gas was in effect on such date; or

(B) the maximum lawful price, per million Btu's, computed for such month under [section 102] of this title (relating to new natural gas).

42 U.S.C. § 3315(b) (1982) (emphasis added).

It is undisputed that the contract price, as determined under paragraph 5.1 of the contract, was lower than the section 102 price at the time the NGPA was enacted. Consequently, the federal ceiling rate for the gas subject to the contract is equal to, and not higher than, the contract price as determined under paragraph 5.1 of the contract.[3] Thus, we hold that, as a matter of law, paragraph 5.6 of the contract was not triggered by the enactment of the NGPA, and therefore, Placid is not entitled to recover the section 102 price for gas sold to LGI. Placid's first, second, and fourth points of error are overruled.

Placid contends, in its third point of error, that the judgment for LGI is contrary to the great weight and preponderance of the evidence. Because the pivotal issue in determining whether Placid is entitled to judgment is whether paragraph 5.6 is a sufficient mechanism to trigger recovery of the section 102 price, we read this point as complaining of the factual support for the trial court's finding that paragraph 5.6 is not a sufficient trigger mechanism. We have already held that, as a matter of law, the language in paragraph 5.6 is not sufficient to trigger immediate recovery of the section 102 price. Therefore, we need not review the evidence to determine if it is factually sufficient to support the trial court's finding. Placid's third point of error is overruled.

In its fifth point of error, Placid asserts that the trial court erred in interpreting the contract based upon extrinsic evidence of the parties' intent without finding that the contract is ambiguous. After considering extrinsic evidence such as the parties' conduct in performing the contract, the trial court concluded that paragraph 5.6 is not a sufficient trigger mechanism and rendered judgment that Placid take nothing. As a matter of law, we have reached the same conclusion by examining only the language of paragraph 5.6. Consequently, any error committed by the trial court in admitting and considering extrinsic evidence of the parties' intent is harmless. *See* TEX.R.APP.PROC. 81(b)(1) (error not reversible unless it was reasonably calculated to cause and probably did cause rendition of an improper judgment by the trial court). Placid's fifth point of error is overruled.

In its sixth and final point of error, Placid maintains that the trial court abused its discretion by awarding attorney's fees to LGI based upon LGI's counterclaim for declaratory judgment. We disagree. In *Contact Products, Inc. v. Dixico Inc.,* 672 S.W.2d 607 (Tex.App.—Dallas 1984, no writ), Contact sued for reformation of a business purchase agreement with Dixico. Dixico counterclaimed, seeking a declaration of the extent of its financial obligation to Contact under the contract. This Court held that section 10 of the Texas Declaratory Judgments Act gave the trial court discretion to award attorney's fees to Dixico on its counterclaim for declaratory relief. *See Contact Products,* 672 S.W.2d at 610. Here, LGI counterclaimed for a judgment declaring its rights, status, and legal relations under the gas purchase contract with Placid. LGI specifically sought recovery of attorney's fees pursuant to section 10 of the Texas Declaratory Judgments Act. We follow *Dixico,* and hold that the trial court

---

**3.** The "ceiling" established by section 105(b) is elastic rather than static. Section 105(b) allows contractual pricing provisions to continue to operate, after the enactment of the NGPA, until the contract price reaches the section 102 price. *See Energy Reserves,* 459 U.S. at 421, 103 S.Ct. at 709. *Louisiana Land & Exploration Co. v. Texa-*

*co, Inc.,* 491 So.2d 363, 366 n. 7 (La.1986). Thus, the parties' intent, in structuring contractual pricing mechanisms that provide for the gradual escalation of prices during the term of the contract, such as paragraph 5.1 in the contract before us, is not defeated by the enactment of section 105(b).

did not abuse its discretion in awarding attorney's fees to LGI. Placid's sixth point of error is overruled.

AFFIRMED.