NUMBER 13-07-00312-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


ANTHONY J. SHIOLENO AND

SRI PROPERTIES, L.P., Appellants,


v.


SANDPIPER CONDOMINIUMS 

COUNCIL OF OWNERS, INC., Appellee.

 


On appeal from the 319th District Court of Nueces County, Texas.

 


MEMORANDUM OPINION


Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Garza


 

 Appellants, Anthony J. Shioleno and SRI Properties, L.P. (collectively "Shioleno"),
appeal from a judgment of the trial court denying mandamus relief and assessing
attorney's fees in favor of appellees, Sandpiper Condominium Council of Owners, Inc.
("Sandpiper"), a non-profit corporation. The underlying lawsuit is a mandamus proceeding
instituted by Shioleno whereby Shioleno sought to compel inspection of Sandpiper's books
and records. (1) By six issues, Shioleno contends that the trial court erred in denying its
mandamus and granting Sandpiper attorney's fees. We reverse and remand for
proceedings consistent with this opinion with respect to Shioleno's inspection rights and
Sandpiper's declaratory judgment action; we affirm the trial court's imposition of reasonable
administrative expenses.

I. Factual and Procedural Background

 Shioleno owns units in the Sandpiper Condominium community in Port Aransas,
Texas. (2) Sandpiper is a Texas non-profit corporation which functions as the condominium
association for the Sandpiper Condominium community. (3)

 Shioleno served on the Sandpiper board of directors until his resignation on April
22, 2006. Prior to his resignation, Shioleno sent a letter on February 2, 2006, to Charles
Crawford, the head of Condominium Consulting Management Services, Inc. ("CCMS"),
informing him of suspected accounting irregularities, poor management practices, and the
mishandling of various reserve funds. In this letter, Shioleno alleged that such practices
had "possible negative tax and financial ramifications reaching all Sandpiper Condo
Owners." Shioleno further requested that CCMS conduct an accounting and cease and
desist from spending additional reserve funds. At trial, Shioleno's trial counsel, Anthony
J. Barbieri, testified that Shioleno never received a response from CCMS regarding its
February 2, 2006 letter. On cross-examination, Barbieri admitted that this letter merely
requested a "full accounting" rather than a request for specific documents or for access to
Sandpiper's facilities. Barbieri further noted that he was not sure whether any of the
Sandpiper directors had received the letter. 

 Subsequently, on March 27, 2006, Fred W. Gosman, III, a forensic accountant hired
by Shioleno, submitted an e-mail to Jim Triplett, Sandpiper's custodian of records. (4) In this
e-mail, Gosman stated that he was hired by Shioleno "to inspect the books, records, and
papers of [Sandpiper]. Our inspection is being performed within Mr. Shioleno's authority
as a member of COA's [condominium owners' association] board of directors . . . ." 
Gosman testified that prior to the March 27, 2006 email, he left several messages for
Triplett indicating that he was traveling to Corpus Christi and that he desired to inspect
Sandpiper's books and records at that time. Gosman noted, however, that he never
received a response from Triplett. 

 Later that day, Gosman traveled to Corpus Christi to inspect Sandpiper's books and
records, and he stayed there until March 31, 2006. While in Corpus Christi, Gosman
repeatedly tried to contact Triplett and Ron Park, Sandpiper's accountant, to schedule an
inspection of Sandpiper's books and records. On March 28, Triplett referred Gosman to
Crawford to schedule the inspection. (5) Subsequently, Park responded to Gosman's
telephone calls, but Park denied Gosman access to Sandpiper's books and records. Upon
contacting Crawford, Gosman was provided a compact disc containing 2,900 pages of
detailed general ledgers generated on March 30, 2006, by CCMS's computer system. At
trial, Gosman noted that this information constituted "batch accounting," and, although
helpful, the information did not include backup transactions, which provide more detailed
information as to what was recorded in the various accounts. On appeal, Shioleno notes
that Gosman was not provided access to the "transaction details for general ledger entries,
[Form] 1099s filed by Sandpiper, access to Sandpiper's computers, or complete
correspondence as requested."

 On April 6, 2006, Gosman was provided with hard copies of Sandpiper's income tax
returns from 2002 to 2006, depreciation schedules, Shioleno's IRS Form 1099, and the
association's management contracts with CCMS from 1999 and 2004. Unhappy with
Sandpiper's efforts in allowing Gosman to inspect its books and records and after several
additional information requests, Shioleno filed a petition for writ of mandamus to compel
Sandpiper to permit inspection of the remaining corporate records on April 18, 2006. In
its petition, Shioleno requested attorney's fees pursuant to section 3.152(c) of the Texas
Business Organizations Code (6) and article 2.44, section D of the Texas Business
Corporations Act. See Act of May 29, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 3.152, 2003
Tex. Gen. Laws 267, 327-28; Tex. Bus. Corp. Act Ann. art. 2.44, § D (Vernon Supp.
2007). (7) On May 15, 2006, Sandpiper filed its original answer, asserting that it had provided
sufficient information for Gosman's inspection of its books and records. Accompanying
Sandpiper's original answer was a counterclaim for a declaratory judgment that it acted in
accordance with the declarations and bylaws of the Sandpiper Condominium community
and for attorney's fees. On August 14, 2006, the trial court granted Shioleno leave of court
to file special exceptions. Shioleno filed its special exceptions with the trial court on
September 15, 2006, alleging that Sandpiper's counterclaim for declaratory relief was
impermissible because it was brought solely to pave the way for attorney's fees. Shioleno
asserted that the Declaratory Judgment Act is not available to settle disputes already
before the trial court and that Sandpiper's counterclaim addresses the same issues
brought forth by Shioleno in its petition for writ of mandamus. (8)

 After a bench trial, the trial court denied Shioleno's petition for writ of mandamus
and granted Sandpiper's counterclaim on April 20, 2007. In doing so, the trial court recited
the following findings in its judgment: (1) the trial court had personal and subject matter
jurisdiction over the parties and claims; (2) Sandpiper fully complied with its bylaws, the
Texas Uniform Condominium Act, see Tex. Prop. Code Ann. § 82.114 (Vernon 2007), and
the Texas Non-Profit Corporation Act "in the timeliness and the manner in which it made
the records of its affairs available for inspection by SHIOLENO," see Tex. Rev. Civ. Stat.
Ann. art. 1396-2.23 (Vernon 2003); (3) that Shioleno may inspect "further records or
computers used by Sandpiper in its operations," but it must reimburse CCMS at the rate
of $50.00 per hour for the time of CCMS's bookkeeper and at the rate of $80.00 per hour
for CCMS's personnel to assemble the records and attend the inspection; and (4)
Sandpiper was entitled to $10,759.00 in attorney's fees based on its declaratory judgment
action. Shioleno filed its notice of appeal on May 18, 2007. This appeal ensued. 

II. Analysis

A. Shioleno's Petition for Writ of Mandamus to Enforce Inspection Rights


 By its first issue, Shioleno contends that a trial court may not refuse to issue a writ
of mandamus permitting a non-profit association member to inspect the association's
books and records once the member has shown its entitlement to inspect such materials
and its requests to do so have been denied. Shioleno also argues that it proved a proper
purpose for the inspection and that Sandpiper failed to negate Shioleno's proper purpose. 
Conversely, Sandpiper argues that Shioleno failed to establish that it was entitled to
mandamus relief because it failed to show that it did not already obtain all relief to which
it was properly entitled. In addition, Sandpiper notes that Shioleno waived its entitlement
to Sandpiper's Forms 1099 at trial.

 1. Applicable Law 

 A writ of mandamus filed in the trial court is the proper remedy to enforce a statutory
right of inspection. Burton v. Cravey, 759 S.W.2d 160, 161 (Tex. App.-Houston [1st Dist.]
1988, no writ), disapproved on other grounds by Huie v. DeShazo, 922 S.W.2d 920, 924
(Tex. 1996); (9) see Uvalde v. Rock Asphalt Co. v. Loughridge, 425 S.W.2d 818, 820 (Tex.
1968) ("A method for the enforcement of the right of inspection or examination of the books
and records of a corporation is by mandamus."). Shioleno did not have to establish an
independent cause of action; it merely had to establish its statutory right to inspect. Id. 

 The Texas Non-Profit Corporation Act provides that a non-profit corporation must
keep "correct and complete books and records of account," and a member of that non-profit corporation has the right "on written demand stating the purpose of the demand . .
. at any reasonable time, for any proper purpose" to examine and copy those books and
records relevant to that purpose, at the member's expense. Tex. Rev. Civ. Stat. Ann. art.
1396-2.23. "The right to inspect under article 1396-2.23 encompasses all books and
records." Burton, 759 S.W.2d at 162 (emphasis added) (internal quotations omitted). 
Additionally, the Texas Uniform Condominium Act provides, in relevant part, that:

 (a) The association shall keep:

 (1) detailed financial records that comply with generally accepted
accounting principles and that are sufficiently detailed to enable the
association to prepare a resale certificate under Section 82.157;

 

 . . . .


 (b) All financial and other records of the association shall be
reasonably available at its registered office or its principal office in this
state for examination by a unit owner and the owner's agents. An
attorney's files and records relating to the association are not records
of the association and are not subject to inspection by unit owners or
production in a legal proceeding.


Tex. Prop. Code Ann. § 82.114 (emphasis added).

 The right of condominium owners to inspect the books and records is only limited
by the requirement that the inspection be for any proper purpose. Burton, 759 S.W.2d at
162. Once Shioleno proved a proper purpose for the inspection, the burden shifted to
Sandpiper to prove that Shioleno's inspection request was for an improper purpose. See
id. (citing Uvalde Rock Asphalt Co., 425 S.W.2d at 820; Moore v. Rock Creek Oil Corp.,
59 S.W.2d 815, 817 (Tex. Comm'n App. 1933, holding approved); 5A Fletcher,
Cyclopedia of the Law of Private Corporations § 2253.1 (1987)). 

 2. Discussion (10)

 a. Shioleno's Written Requests to Inspect Sandpiper's Books and 
Records


 Sandpaper's bylaws echo the statutory provisions requiring Sandpiper to make its
books and records available to owners. See Tex. Rev. Civ. Stat. Ann. art. 1396-2.23;
Tex. Prop. Code Ann. § 82.114. Specifically, section 3.11 of the Sandpiper's bylaws
provides that:

 The Board of Directors shall keep or cause to be kept sufficient books and
records with a detailed account of the receipts and expenditures of the
Council. Such books and records must comply with good accounting
procedures and must be audited at least once each year by an auditor who
is not associated with the Project. The books, records and papers of the
Council shall at all times during reasonable business hours be subject to
inspection by any Member of the Council.


(Emphasis added.)

 Shioleno first requested to inspect Sandpiper's books and records on February 2,
2006, stating that the purpose of the inspection was to expose accounting irregularities,
poor management practices, and the mishandling of various reserve funds by Sandpiper
that had "possible negative tax and financial ramifications reaching all Sandpiper Condo
Owners." This request was sent to Crawford, and Barbieri testified at trial that he did not
receive a response. On March 27, 2006, Gosman sent an e-mail to Triplett requesting that
Sandpiper's books and records be made available for inspection. In this e-mail, Gosman
listed fifteen items of particular importance to the inspection, yet he specifically noted the
following: "[p]lease understand that the above list of items may not be all-inclusive, as
additional information and documents may become needed during the course of our
procedures." Gosman testified at trial that he includes this language in every inspection
request he makes because he is unsure of what information will be provided. However,
Gosman noted that, in this case, he requested a detailed general ledger, among other
things, "in order to truly understand the transactions that had been reported . . . ."

 At the time these requests were sent, it is undisputed that Shioleno was a member
of the Sandpiper Condominium community for at least six months, and he was a director
on Sandpiper's board of directors. (11) In its petition for writ of mandamus, Shioleno stated
that the purpose for the inspection was "related to his interests as a director of the
corporation whose function it is to examine corporate circumstances and evaluate actions
proposed by the board of directors." Additionally, Shioleno testified at trial that the reason
he invoked his inspection rights was that he "became concerned about certain ways that
accounting was being performed at the Sandpiper." Shioleno also testified that in his role
as a Sandpiper director, he observed that "the quality of life wasn't improved [for individual
condo owners] and expenses went up." 

 In its first amended original answer and counterclaim, Sandpiper merely stated that
Shioleno failed to satisfy the conditions precedent--i.e., establishing a proper purpose--for
its request for inspection. However, Sandpiper did not provide any evidence to support its
conclusory statement that Shioleno had failed to establish a proper purpose. In fact, on
appeal, Sandpiper does not contest Shioleno's purpose for initiating the inspection. Based
on our review of the record, we conclude that Shioleno provided the requisite written
demand accompanied by a statement indicating a proper purpose. See Tex. Rev. Civ.
Stat. Ann. art. 1396-2.23; see also Burton, 759 S.W.2d at 162. Moreover, we find that
Sandpiper failed to prove that Shioleno had an improper purpose for requesting to inspect
its books and records. See Burton, 759 S.W.2d at 162.

 b. Sandpiper's Denial of Shioleno's Inspection Rights and Its Attempts 
 to Comply with Shioleno's Subsequent Requests 


 Shioleno alleges and the record appears to suggest that: (1) Sandpiper repeatedly
denied him access to its books and records apparently maintained at its principal office in
Corpus Christi; and (2) Sandpiper continually provided incomplete information as to the
financial health of the association as required by statute and by its bylaws. Shioleno
testified that Sandpiper still had not provided all the books and records referenced in the
February 2, 2006 and March 27, 2006 requests. Gosman received 2,900 pages of a
general ledger in electronic form on March 28, 2006; he received an additional 465 pages
of board minutes on March 30, 2006; and he received Sandpiper's tax returns and the
management contracts between CCMS and Sandpiper on April 6, 2006. However,
Gosman testified that he did not receive depreciation registers from Sandpiper until the
week of the August 14, 2006 trial. Gosman further testified to the following:

 Q: [Shioleno's counsel]: Had you had access to the books and records
and the computer files when you were down
here [Corpus], would it have been necessary for
a work effort, I'll call it, by CCMS to gather this
stuff and copy it and give it to you?


 A: [Gosman]: Well, no. That was the basis for my being here,
was to ease the effort to produce this
information. If the information is right there in a
file cabinet, then it's very simple to say, "Well,
the information is right there." "If you want
copies, fine. We'll make you copies, you can
make copies, but the information is right there."

 See, the books and records that we asked for
are what's kept in the normal course of business. 
It's nothing that needs to be newly created or
pulled out of the ether [sic]. I mean, it's the
books and records that they have to have to run
their own business for their own financial
reporting. So we aren't asking them to create
anything, we were just simply asking access to
what they already had.

 

 Q: And I believe you testified before that you were
denied that access?

 

 A: In part, yes.

 

 Q: All right.

 

 A: I am the first one to agree we got a lot of
information, but there were some really important
parts left out.

 

 Barbieri testified that he sent an e-mail on April 21, 2006, to John Holmgreen,
Sandpiper's trial counsel, as a last attempt to enforce Shioleno's inspection rights,
requesting that Sandpiper make the remaining books and records available for inspection. 
Barbieri noted in the e-mail that he and Shioleno were in Corpus Christi from April 21 to
22 and that they could easily stop by Sandpiper's principal office and conduct the
inspection of the remaining books and records. On April 22, 2006, Holmgreen sent an e-mail to Barbieri granting access to Sandpiper's remaining books and records and computer
files on Sunday, April 23. (12) Holmgreen also noted that Shioleno could inspect Sandpiper's
computer systems on Saturday, April 22, at 10:00 p.m. However, Barbieri and Shioleno
were not able to inspect the records on these dates because they were scheduled to leave
Corpus Christi prior to 10:00 p.m. on April 22, as Barbieri had stated in his e-mail to
Holmgreen. 

 Then, on June 15, 2006, Holmgreen sent Barbieri another letter noting that
Sandpiper had granted Shioleno access to the remaining books and records and computer
systems from "Monday, June 19, 2006, and continuing until Friday, June 23, 2006, from
8:30 a.m. until 5:00 p.m." Holmgreen further noted that "[t]he records to which this
response applies are the records described in ¶ 15 of Mr. Gosman's communication of
March 27, 2006, and ¶ ¶ 7, 8, and 12 of your letter of April 21, 2006," indicating that
Sandpiper still had not complied with Shioleno's initial requests for inspection of its books
and records. 

 Sandpiper relies heavily on an e-mail sent by Barbieri to Holmgreen on August 10,
2006, stating that the parties should arrange to inspect the computers and computer files
at Sandpiper and CCMS after the bench trial on August 14, 2006. Sandpiper argues that
this statement confirms "yet another of Appellee's repeated offers, prior to the hearing, to
have Appellants inspect its computer systems." (Emphasis in original.) On appeal,
Sandpiper notes that on three separate occasions, Shioleno was granted access to inspect
its books and records: April 22, June 15, and August 10. 

 While it appears Sandpiper tried to accommodate Shioleno's schedule, in the end,
according to Barbieri's August 10, 2006 e-mail, Sandpiper still had not produced much of
the requested information, including: (1) backup or supporting information for the
previously supplied general ledger entries; (2) fixed asset and depreciation registers for all
activity between September 30, 2002, and September 30, 2005; (3) all contracts and
agreements involving Sandpiper and the services of any employee, contractor, or company
from October 2003 to August 2006; (4) all correspondence between Sandpiper board
members other than the minutes of the board of directors meetings; (5) all correspondence
between Ron Park and Sandpiper from October 2003 to August 2006; (13) and (6) all work
papers provided for the audit of Sandpiper, including the Resort Fund, from September 30,
2003 through September 30, 2005. 

 Based on the foregoing, we conclude that Sandpiper failed to comply with section
82.114 of the property code, article 1396-2.23, and section 3.11 of its own bylaws in
making its books and records available to Shioleno at a reasonable time after Shioleno's
initial request for inspection. See Tex. Rev. Civ. Stat. Ann. art. 1396-2.23; Tex. Prop.
Code Ann. § 82.114. Shioleno was entitled to personally inspect Sandpiper's books and
records upon his first written request stating a proper purpose. See Tex. Rev. Civ. Stat.
Ann. art. 1396-2.23; see also Burton, 759 S.W.2d at 162 (noting that "[t]he right to
inspection under article 1396-2.23 encompasses all books and records") (internal
quotations omitted) (emphasis added). We believe that the legislature's intent in granting
owners inspection rights of the books and records of a non-profit corporation was "to
provide owners with ready access to the books and records of their condominium and the
most logical place for keeping these records is on the premises." Bd. of Directors of By the
Sea Council of Co-Owners, Inc. v. Sondock, 644 S.W.2d 774, 782 (Tex. App.-Corpus
Christi 1982, writ ref'd n.r.e). Furthermore, it does not appear that Sandpiper was
authorized to deny Shioleno access to its books and records given that Shioleno had
stated a proper purpose for the inspection. (14) See Tex. Rev. Civ. Stat. Ann. art. 1396-2.23;
Tex. Prop. Code Ann. § 82.114; see also Burton, 759 S.W.2d at 162. 

 We do not find Sandpiper's grants of access to its books and records on April 22,
June 15, and August 10, in keeping with the legislature's intent. See Tex. Rev. Civ. Stat.
Ann. art. 1396-2.23; Tex. Prop. Code Ann. § 82.114; see also Burton, 759 S.W.2d at 162;
Sondock, 644 S.W.2d at 782. In particular, Sandpiper's grant of access to its books and
records on April 22--the day that Barbieri stated to Holmgreen that he and Shioleno had
to leave Corpus Christi--at 10:00 p.m. can hardly be construed as reasonable given that
its bylaws require that inspections transpire "during reasonable business hours . . . ." 
Moreover, we do not find Sandpiper's grant of access to its books and records on June 15
and August 10, after several additional requests were made by Shioleno and more than
four months after Shioleno's initial request to inspect Sandpiper's books and records, to
be reasonable. 

 It is unclear to this Court why Sandpiper did not acquiesce to Shioleno's initial
written demands for inspection until more than four months had elapsed if the books and
records were, indeed, kept at the Corpus Christi office as required. See Tex. Rev. Civ.
Stat. Ann. art. 1396-2.23; Tex. Prop. Code Ann. § 82.114. Because Shioleno was not
permitted access to Sandpiper's books and records at Sandpiper's Corpus Christi office
at a reasonable time after Shioleno made his initial request stating a proper purpose for
inspection and because Sandpiper still has not produced all of the relevant documents
requested, (15) we conclude that Sandpiper has not complied with the Texas Non-Profit
Corporation Act, the Texas Uniform Condominium Act, and its own bylaws. See Tex. Rev.
Civ. Stat. Ann. art. 1396-2.23; Tex. Prop. Code Ann. § 82.114. Accordingly, we sustain
Shioleno's first issue on appeal.

B. Sandpiper's Counterclaim for Declaratory Relief and Attorney's Fees

 By its second, third, and sixth issues, Shioleno asserts that Sandpiper's
counterclaim for declaratory relief was impermissible because it raised the same issues of
compliance with the association's governing documents as were addressed in Shioleno's
petition for writ of mandamus. Specifically, Shioleno argues that Sandpiper cannot bring
a counterclaim under the Texas Declaratory Judgment Act ("DJA") where the counterclaim
merely re-asserts a party's affirmative defense to the underlying suit. In addition, Shioleno
argues that the trial court abused its discretion in awarding Sandpiper attorney's fees
because Sandpiper was not the "prevailing party." Sandpiper, on the other hand, contends
that Shioleno failed to preserve this issue for appeal. In addition, Sandpiper argues that
its counterclaim, though related to Shioleno's original claim, sought "affirmative relief
concerning the ongoing relationship between the parties," thereby making its counterclaim
permissible. 

 1. Applicable Law

 Declaratory judgments are reviewed under the same standards as all other
judgments. Tex. Civ. Prac. & Rem. Code Ann. § 37.010 (Vernon 1997); In re Estate of
Schiwetz, 102 S.W.3d 355, 365 (Tex. App.-Corpus Christi 2003, no pet.). We look to the
procedure used to resolve the issue at trial to determine the standard of review on appeal. 
Guthery v. Taylor, 112 S.W.3d 715, 720 (Tex. App.-Houston [14th Dist.] 2003, no pet.);
Roberts v. Squyres, 4 S.W.3d 485, 488 (Tex. App.-Beaumont 1999, pet. denied). The trial
court's conclusion, being one of law, will be upheld on appeal if it can be sustained on any
legal theory supported by the evidence. See Alma Invs., Inc. v. Bahia Mar Co-Owners
Ass'n, 999 S.W.2d 820, 823 (Tex. App.-Corpus Christi 1999, pet. denied). 

 Section 37.004 of the civil practice and remedies code provides:

 (a) A person[ (16)] interested under a deed, will, written contract, or other writing
constituting a contract or whose rights, status, or other legal relations are
affected by a statute, municipal ordinance, contract, or franchise may have
determined any question of construction or validity arising under the
instrument, statute, ordinance, contract, or franchise and obtain a declaration
of rights, status, or other legal relations thereunder.


Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (Vernon 1997). Moreover, section 37.002
states that chapter 37 of the civil practice and remedies code is intended to be remedial
in nature and "its purpose is to settle and to afford relief from uncertainty and insecurity
with respect to rights, status, and other legal relations; and it is to be liberally construed
and administered." Id. § 37.002(b) (Vernon 1997). 

 However, declaratory relief is not available to settle a dispute that is currently
pending before a court. BHP Petroleum Co., Inc. v. Millard, 800 S.W.2d 838, 841 (Tex.
1990) (orig. proceeding); Staff Ind., Inc. v. Hallmark Contracting, Inc., 846 S.W.2d 542,
547-48 (Tex. App.-Corpus Christi 1993, no writ); John Chezik Buick v. Friendly Chevrolet,
749 S.W.2d 591, 594 (Tex. App.-Dallas 1988, writ denied) (concluding that a declaratory
judgment counterclaim was not properly brought because the issue raised by the
defendant was already before the court as part of the plaintiff's case). Furthermore, a
defendant cannot institute a cross-action for declaratory relief if the cross-action fails to
present a justiciable controversy separate from the underlying suit. See Hitchcock Props.,
Inc. v. Levering, 776 S.W.2d 236, 239 (Tex. App.-Houston [1st Dist.] 1989, writ denied);
see also Narisi v. Legend Diversified Invs., 715 S.W.2d 49, 51-52 (Tex. App.-Dallas 1986,
writ ref'd n.r.e.) (holding that a counterclaim brought under the DJA that presents no new
controversies, but is engineered solely to pave an avenue for an award of attorney's fees,
is not proper).

 2. Discussion

 We first address Sandpiper's contention that Shioleno failed to preserve this issue
for appellate review. (17) To preserve a complaint for appellate review, the complaining party
must present the complaint to the trial court with sufficient specificity to make the trial court
aware of the complaint. Tex. R. App. P. 33.1(a). In its special exceptions, Shioleno
claimed that Sandpiper's declaratory judgment action was impermissible because it
addressed the same issues raised in Shioleno's petition for writ of mandamus in order to
pave the way for attorney's fees. Given that Shioleno raised this contention with the trial
court in its special exceptions, we conclude that Shioleno has preserved this issue for
appellate review. See id.

 In its counterclaim for declaratory relief, Sandpiper sought "a declaration . . . that the
Council acted in accordance with the Declaration and Bylaws of the Sandpiper
Condominium and for the Council's attorneys' [sic] fees." In support of its counterclaim,
Sandpiper argued that it had produced the records Shioleno had requested, that Shioleno
had failed to satisfy the conditions precedent to its request for inspection, and that the
purpose of the inspection was improper. Essentially, these contentions are at the crux of
Shioleno's action for mandamus relief. It is clear to this Court that the contentions made
in Sandpiper's counterclaim for declaratory relief--Sandpiper's compliance with its
declarations and bylaws--were already in dispute as a part of Shioleno's case and that
Sandpiper's counterclaim was brought for the purpose of obtaining attorney's fees under
the DJA. See BHP Petroleum Co., Inc., 800 S.W.2d at 841; Narisi, 715 S.W.2d at 51-52. 

 Sandpiper relies on the holdings in BHP Petroleum, 800 S.W.2d at 841-82 and
Placid Oil Co. v. Louisiana Gas Intrastate, Inc., 734 S.W.2d 1, 5-6 (Tex. App.-Dallas 1987,
writ ref'd n.r.e) to support its contention that its counterclaim for declaratory relief brought
forth a justiciable controversy because of the ongoing nature of the relationship between
the parties. Sandpiper further alleges that these cases support its contention that the trial
court did not err in awarding it attorney's fees. We disagree.

 In BHP Petroleum, the Texas Supreme Court concluded that when a "declaratory
judgment counterclaim ha[s] greater ramifications than the original suit," the court may
allow the counterclaim. 800 S.W.2d at 842. BHP Petroleum ("BHP"), a producer and
seller of natural gas, brought suit in Harris County against ANR Pipeline Company ("ANR"),
an entity engaged in the purchasing, transporting, and selling of natural gas, for various
breaches of contract. Id. at 839. ANR filed an original answer and counterclaim for
declaratory relief asserting, among other things, "that revolutionary changes in the
interstate natural gas industry have combined to excuse ANR's customers from obligation
to gas from ANR . . . ." Id. at 839 & n.4. The supreme court noted that "BHP's suit is
essentially one for breach of the 'take-or-pay' obligation of the gas purchase contract and
'consequential damages' and requested relief for underpayment for ANR's alleged failure
to purchase or pay for specific quantities of BHP's gas . . . ." Id. at 842. The supreme
court further noted that "ANR's counterclaim sought an interpretation of the gas purchase
contract which would have the effect of defining the obligations of the parties under the
contract for the foreseeable future." Id. Based on the uncertainty created by changing
industry conditions, the supreme court concluded that the ANR's counterclaim had greater
ramifications than BHP's original suit and, therefore, allowed the counterclaim to remain. 
Id. 

 Here, Sandpiper's counterclaim does not have greater ramifications than the
underlying suit instituted by Shioleno. In fact, Sandpiper stated in its first amended original
answer and counterclaim that it "asserts a counterclaim against Anthony J. Shioleno and
SRI Properties, Inc., counterdefendants, for a declaration . . . that the Council has acted
in accordance with the Declaration and Bylaws of the Sandpiper Condominium and for the
Council's attorneys' [sic] fees." Unlike ANR in BHP Petroleum, Sandpiper certainly has
not alleged that extraordinary circumstances have arisen that would govern the obligations
of the parties in the foreseeable future. See id. at 839, 842 & n.4. Instead, the issues
raised in Sandpiper's counterclaim are precisely the issues that are disputed in Shioleno's
suit.

 In Placid Oil, appellant brought a breach of contract claim against appellee,
Louisiana Gas Intrastate, Inc. ("LGI"), pertaining to a gas sales contract. 734 S.W.2d at
2. Specifically, Placid Oil contended that LGI had underpaid for gas sold under the
contract. Id. LGI counterclaimed, seeking declaratory relief and attorney's fees. Id. LGI's
counterclaim sought a declaration of rights, status, and legal relations under the gas
purchase contract with Placid Oil. Id. The trial court rendered judgment for LGI on its
counterclaims and rendered a take-nothing judgment against Placid Oil. Id. The Dallas
Court of Appeals affirmed the judgment of the trial court and concluded, among other
things, that the trial court did not abuse its discretion in awarding LGI attorney's fees based
upon its counterclaim for declaratory judgment. Id. at 5-6. The court specifically noted that
the "[DJA] gave the trial court discretion to award attorney's fees." Id. at 5. 

 Unlike here, the court in Placid Oil concluded that LGI had complied with the
underlying contract. Id. at 3-5. In fact, the Placid Oil court was faced with issues pertaining
to choice of law --whether Texas or Louisiana law applied--and the definition of industry-specific terms governing the gas sales contract. Id. Furthermore, Placid Oil did not appeal
the propriety of LGI's counterclaim with respect to justiciability. As a result, the Placid Oil
court did not address the justiciability of LGI's counterclaim for declaratory relief. In
awarding LGI attorney's fees, the Dallas Court of Appeals relied solely on the fact that the
DJA provides that a trial court may award attorney's fees in its discretion. See id. Based
on the foregoing, we do not find the holdings in BHP Petroleum and Placid Oil to be
persuasive in this matter. We therefore conclude that Sandpiper, in its counterclaim, failed
to present a justiciable controversy apart from Shioleno's suit. See Hitchcock Props., Inc.,
776 S.W.2d at 239; see also Narisi, 715 S.W.2d at 51-52. 

 With respect to attorney's fees, the DJA allows the trial court to award reasonable
and necessary attorney's fees that the court considers to be equitable and just. Tex. Civ.
Prac. & Rem. Code Ann. § 37.009 (Vernon 1997). However, the award of attorney's fees
under the DJA is a matter of discretion. Roberson v. City of Austin, 157 S.W.3d 130, 137
(Tex. App.-Austin 2005, pet. denied). "A prevailing party in a declaratory judgment action
is not entitled to attorney's fees simply as a matter of law; entitlement depends on what is
equitable and just and the trial judges' power is in that respect discretionary." Id. (quoting
Unified Loans v. Pettijohn, 955 S.W.2d 649, 654 (Tex. App.-Austin 1997, no pet.)). In this
case, the trial court award Sandpiper $10,759.00 in attorney's fees based upon its
conclusion that Sandpiper had brought a viable counterclaim for declaratory relief. 
Because Sandpiper's counterclaim failed to present a justiciable controversy apart from
Shioleno's suit, we conclude that the trial court abused its discretion in awarding Sandpiper
attorney's fees. Accordingly, we sustain Shioleno's second, third, and sixth issues on
appeal. 

C. Financial Obligations and the Right to Inspect a Non-Profit Corporation's Books 
 and Records


 By its fifth issue, Shioleno argues that financial obligations cannot be imposed upon
a member requesting to inspect records of a condominium association under either the
Texas Uniform Condominium Act or the association's bylaws. Shioleno also argues on
appeal that the trial court did not have subject matter jurisdiction over inspection fees
because this issue was neither before the trial court nor was a justiciable controversy that
the trial court could resolve. 

 The Texas Non-Profit Corporation Act provides for examination and copying of
books and records, at the member's expense. Tex. Rev. Civ. Stat. Ann. art. 1396-2.23.
Shioleno argues it did not seek relief under the Texas Non-Profit Corporation Act, rather
based its right of inspection on the association's bylaws and the Texas Uniform
Condominium Act, neither of which provide for costs of examination. Nonetheless, the
Texas Non-Profit Corporation Act clearly applies to this dispute, and the trial court was
entitled to consider it in its judgment. See id.; see also KB Home v. Employers Mut. Cas.
Co., No. 2-06-383-CV, 2008 Tex. App. LEXIS 771, at *16 (Tex. App.-Fort Worth Jan. 31,
2008, no pet.) (noting that "it is axiomatic that artful pleading cannot change the character
of a lawsuit. In the vernacular, calling a duck a chicken does not make it so"); Head v. U.S.
Inspect DFW, Inc., 159 S.W.3d 731, 742 (Tex. App.-Fort Worth 2005, no pet.) ("A plaintiff
by artful pleading cannot recast a claim in order to avoid the adverse effect of a statute.");
Alma Group, L.L.C. v. Palmer, 143 S.W.3d 840, 843-44 (Tex. App.-Corpus Christi 2004,
pet. denied) (stating, among other things, that a trial court has no discretion in deciding the
law or its proper application). 

 Prior to entry of judgment, Shioleno's counsel stipulated to payment of reasonable
administrative expenses. Specifically, Shioleno's counsel noted the following: 

 And let me clarify something, Your Honor. Mr. Shioleno is willing to pay
for--if somebody from the Sandpiper, or CCMS, needs to have some
administrator or somebody spend time showing Mr. Gosman these books
and records, we will be more than happy to reimburse them for those
expenses, but we don't feel we should have to pay for any unnecessary
expenses; i.e. copying of documents, where there's no need to copy
documents; i.e., paying for attorney's fees when there's no reason--there
was no reason for us to even have to file a suit if they would have complied
with their obligations to begin with. 


This stipulation coupled with the evidence at trial provides ample support for the trial court's
judgment. (18) 

 Accordingly, we overrule Shioleno's fifth issue. 

III. Conclusion

 We reverse the judgment of the trial court and remand for proceedings consistent
with this opinion with respect to Shioleno's inspection rights and Sandpiper's declaratory
judgment action. However, we affirm the trial court's award of reasonable administrative
expenses. We need not address Shioleno's fourth issue on appeal given that we have
concluded that Sandpiper's counterclaim did not present a justiciable controversy. See
Tex. R. App. P. 47.1.

 ______________________________

 DORI CONTRERAS GARZA,

 Justice


Memorandum Opinion delivered and 

filed this the 17th day of July, 2008. 

 


1. This is an appeal from an original proceeding for a writ of mandamus initiated in the trial court which
is different from an original proceeding for a writ of mandamus filed in an appellate court. See Anderson v.
City of Seven Points, 806 S.W.2d 791, 792 n.1 (Tex. 1991). "An original proceeding for a writ of mandamus
initiated in the trial court is a civil action subject to trial and appeal on substantive law issues and the rules of
procedure as any other civil suit." Id.
2. Shioleno owns SRI Properties, L.P.
3. The parties do not dispute Sandpiper's non-profit status; in fact, Sandpiper's non-profit status is
specifically noted in its Articles of Incorporation.
4. Testimony at trial established that Sandpiper was aware that Gosman was Shioleno's authorized
representative and agent in conducting the inspection of Sandpiper's books and records.
5. The record contains an e-mail sent by William Perry to Sandpiper board members on March 28,
2006, with the term, "Alert," contained in the subject line of the e-mail. The e-mail stated the following: "Fred
Gosman, a CPA hired by Tony, has contacted Jim Triplett, CCMS, Ron Park, and Chave with questions about
our books, accounting, etc."
6. The Texas Business Organizations Code does not apply to existing domestic or foreign entities until
January 1, 2010, unless the entity elects to adopt the provisions early. See Act of May 29, 2003, 78th Leg.,
R.S., ch. 182, § 1, sec. 402.005, 2003 Tex. Gen. Laws 267, 593. The record does not reflect that Sandpiper
elected to adopt the business organizations code provisions early.
7. At trial, Shioleno argued that it was entitled to attorney's fees under section 82.161(a) of the property
code rather than section 3.152 of the business organizations code or article 2.44(D) of the Texas Business
Corporations Act, both of which the parties agreed were inapplicable given Sandpiper's non-profit status. See
Burton v. Cravey, 759 S.W.2d 160, 162 (Tex. App.-Houston [1st Dist.] 1988, no writ); see also Tex. Bus.
Corp. Act Ann. art. 9.14(A) (Vernon Supp. 2007); Tex. Prop. Code Ann. § 82.161(a) (Vernon 2007) ("The
prevailing party in an action to enforce the declaration, bylaws, or rules is entitled to reasonable attorney's fees
and costs of litigation from the nonprevailing party."). The record reflects that Shioleno did not plead for
section 82.161 attorney's fees in its petition for writ of mandamus. See Tex. Prop. Code Ann. § 82.161(a). 
However, the trial court allowed (1) Shioleno to amend its pleadings and (2) Barbieri to testify as to the issue
of attorney's fees. The record contains a brief filed by Shioleno in support of its petition for writ of mandamus
whereby Shioleno specifically noted that section 82.161 provides for attorney's fees in the event that it is the
prevailing party. On appeal, Shioleno does not address its entitlement to attorney's fees. Instead, Shioleno
merely attacks the propriety of the trial court's awarding of attorney's fees to Sandpiper.
8. It is undisputed that Shioleno's special exceptions were denied by the trial court.
9. On appeal, Sandpiper contends that Shioleno erroneously relies on Burton, 759 S.W.2d at 161, a
case "discredited" by the Texas Supreme Court in Huie v. DeShazo, 922 S.W.2d 920, 924 (Tex. 1996). 
However, Sandpiper's contention is not entirely accurate. In Huie, the supreme court concluded that "to the
extent that the court held that the owners' statutory right of inspection somehow trumped the privilege for
confidential attorney-client communications, we disapprove of its holding . . . . We also disapprove of the
court's dicta that the trial court could, in its discretion, decline to apply the attorney-client privilege even if all
the elements of Rule 503 were met." 922 S.W.2d at 924. Therefore, the Huie court merely disapproved of
the Burton decision with respect to an owner's request to inspect attorney records as part of the association's
records. Id.
10. In its petition for writ of mandamus, Shioleno contended that it was entitled to Forms 1099 that
Sandpiper had in its records. However, on appeal, Shioleno states that "[t]he sole exception to the records
sought through mandamus but not produced is [the] 1099s relating to other owners which, as discussed
herein, are no longer in controversy."
11. At trial, Shioleno testified that he currently owned two units in the Sandpiper Condominium
community and that he had previously owned two additional units in the community.
12. In his April 22, 2006 e-mail, Holmgreen noted the following, in relevant part: "Tony--Sorry I missed
your departure during the second (rental) meeting this afternoon. If Mr. Shioleno still wishes to take
advantage of being here to inspect records and computer systems, as I described this morning, please call
me . . . . CCMS can make its offices available for this tomorrow (Sunday) [April 23, 2006]. Respectfully, John
Holmgreen."
13. Sandpiper argued at trial and now argues on appeal that it attempted to procure records from Ron
Park, but he refused to turn over any documents. Park claimed that the documents in his possession were
work product and were, thus, privileged. As a result, the Park papers have not been made available for
inspection by Shioleno. The propriety of Park's claim of privilege is not within the scope of this appeal.
14. Sandpaper was entitled to raise a fact issue over whether Shioleno had a proper purpose for
wanting to see the books, but it failed to do so. See Uvalde Rock Asphalt Co. v. Loughridge, 425 S.W.2d 818,
820 (Tex. 1968).
15. In fact, at the hearing on the motion to enter judgment, Sandpiper's counsel acknowledged they
were prepared to provide Shioleno access to the computers and the "backup and supporting information" that
had been requested. Thus, by Sandpiper's own admission, it has not fully complied with Shioleno's requests.
16. Section 37.001 of the civil practice and remedies code provides that a "person" is "an individual,
partnership, joint-stock company, unincorporated association or society, or municipal or other corporation of
any character." Tex. Civ. Prac. & Rem. Code Ann. § 37.001 (Vernon 1997). 
17. Sandpiper argues that special exceptions are pleas and that Shioleno was not permitted to submit
its special exceptions on the day of trial. Specifically, Sandpiper notes that for pleadings filed within seven
days of trial, leave of court must be obtained. Rule 63 of the Texas Rules of Civil Procedure states that leave
of court "shall be granted by the judge unless there is a showing that such filing will operate as a surprise to
the opposite party." Tex. R. Civ. P. 63. The record reflects, and Sandpiper admits in its response to
Shioleno's special exceptions, that the trial court granted Shioleno leave to file its special exceptions to
Sandpiper's declaratory judgment action. See Tex. Prop. Code Ann. § 82.161. Therefore, we consider
Shioleno's special exceptions to have been properly filed and considered by the trial court.
18. Specifically, Crawford testified that it would take two to three days to assemble Sandpiper's records
and that the hourly rate for Kathy Vanna, CCMS's bookkeeper, was $50.00 and his hourly rate for overseeing
the inspection was $80.00.