

NUMBER 13-07-00312-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ANTHONY J. SHIOLENO AND
SRI PROPERTIES, L.P.,                                      **Appellants,**

**v.**

SANDPIPER CONDOMINIUMS
COUNCIL OF OWNERS, INC.,                              **Appellee.**

On appeal from the 319th District Court of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion by Justice Garza**

Appellants, Anthony J. Shioleno and SRI Properties, L.P. (collectively "Shioleno"),

appeal from a judgment of the trial court denying mandamus relief and assessing

attorney's fees in favor of appellees, Sandpiper Condominium Council of Owners, Inc.

("Sandpiper"), a non-profit corporation. The underlying lawsuit is a mandamus proceeding instituted by Shioleno whereby Shioleno sought to compel inspection of Sandpiper's books and records.[1] By six issues, Shioleno contends that the trial court erred in denying its mandamus and granting Sandpiper attorney's fees. We reverse and remand for proceedings consistent with this opinion with respect to Shioleno's inspection rights and Sandpiper's declaratory judgment action; we affirm the trial court's imposition of reasonable administrative expenses.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Shioleno owns units in the Sandpiper Condominium community in Port Aransas, Texas.[2] Sandpiper is a Texas non-profit corporation which functions as the condominium association for the Sandpiper Condominium community.[3]

Shioleno served on the Sandpiper board of directors until his resignation on April 22, 2006. Prior to his resignation, Shioleno sent a letter on February 2, 2006, to Charles Crawford, the head of Condominium Consulting Management Services, Inc. ("CCMS"), informing him of suspected accounting irregularities, poor management practices, and the mishandling of various reserve funds. In this letter, Shioleno alleged that such practices had "possible negative tax and financial ramifications reaching all Sandpiper Condo Owners." Shioleno further requested that CCMS conduct an accounting and cease and

---

[1] This is an appeal from an original proceeding for a writ of mandamus initiated in the trial court which is different from an original proceeding for a writ of mandamus filed in an appellate court. *See Anderson v. City of Seven Points,* 806 S.W.2d 791, 792 n.1 (Tex. 1991). "An original proceeding for a writ of mandamus initiated in the trial court is a civil action subject to trial and appeal on substantive law issues and the rules of procedure as any other civil suit." *Id.*

[2] Shioleno owns SRI Properties, L.P.

[3] The parties do not dispute Sandpiper's non-profit status; in fact, Sandpiper's non-profit status is specifically noted in its Articles of Incorporation.

2

desist from spending additional reserve funds. At trial, Shioleno's trial counsel, Anthony J. Barbieri, testified that Shioleno never received a response from CCMS regarding its February 2, 2006 letter. On cross-examination, Barbieri admitted that this letter merely requested a "full accounting" rather than a request for specific documents or for access to Sandpiper's facilities. Barbieri further noted that he was not sure whether any of the Sandpiper directors had received the letter.

Subsequently, on March 27, 2006, Fred W. Gosman, III, a forensic accountant hired by Shioleno, submitted an e-mail to Jim Triplett, Sandpiper's custodian of records.[4] In this e-mail, Gosman stated that he was hired by Shioleno "to inspect the books, records, and papers of [Sandpiper]. Our inspection is being performed within Mr. Shioleno's authority as a member of COA's [condominium owners' association] board of directors . . . ." Gosman testified that prior to the March 27, 2006 email, he left several messages for Triplett indicating that he was traveling to Corpus Christi and that he desired to inspect Sandpiper's books and records at that time. Gosman noted, however, that he never received a response from Triplett.

Later that day, Gosman traveled to Corpus Christi to inspect Sandpiper's books and records, and he stayed there until March 31, 2006. While in Corpus Christi, Gosman repeatedly tried to contact Triplett and Ron Park, Sandpiper's accountant, to schedule an inspection of Sandpiper's books and records. On March 28, Triplett referred Gosman to Crawford to schedule the inspection.[5] Subsequently, Park responded to Gosman's

---

[4] Testimony at trial established that Sandpiper was aware that Gosman was Shioleno's authorized representative and agent in conducting the inspection of Sandpiper's books and records.

[5] The record contains an e-mail sent by William Perry to Sandpiper board members on March 28, 2006, with the term, "Alert," contained in the subject line of the e-mail. The e-mail stated the following: "Fred Gosman, a CPA hired by Tony, has contacted Jim Triplett, CCMS, Ron Park, and Chave with questions about

telephone calls, but Park denied Gosman access to Sandpiper's books and records. Upon contacting Crawford, Gosman was provided a compact disc containing 2,900 pages of detailed general ledgers generated on March 30, 2006, by CCMS's computer system. At trial, Gosman noted that this information constituted "batch accounting," and, although helpful, the information did not include backup transactions, which provide more detailed information as to what was recorded in the various accounts. On appeal, Shioleno notes that Gosman was not provided access to the "transaction details for general ledger entries, [Form] 1099s filed by Sandpiper, access to Sandpiper's computers, or complete correspondence as requested."

On April 6, 2006, Gosman was provided with hard copies of Sandpiper's income tax returns from 2002 to 2006, depreciation schedules, Shioleno's IRS Form 1099, and the association's management contracts with CCMS from 1999 and 2004. Unhappy with Sandpiper's efforts in allowing Gosman to inspect its books and records and after several additional information requests, Shioleno filed a petition for writ of mandamus to compel Sandpiper to permit inspection of the remaining corporate records on April 18, 2006. In its petition, Shioleno requested attorney's fees pursuant to section 3.152(c) of the Texas Business Organizations Code[6] and article 2.44, section D of the Texas Business Corporations Act. *See* Act of May 29, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 3.152, 2003 Tex. Gen. Laws 267, 327-28; TEX. BUS. CORP. ACT ANN. art. 2.44, § D (Vernon Supp.

our books, accounting, etc."

[6] The Texas Business Organizations Code does not apply to existing domestic or foreign entities until January 1, 2010, unless the entity elects to adopt the provisions early. *See* Act of May 29, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 402.005, 2003 Tex. Gen. Laws 267, 593. The record does not reflect that Sandpiper elected to adopt the business organizations code provisions early.

4

2007).[7] On May 15, 2006, Sandpiper filed its original answer, asserting that it had provided sufficient information for Gosman's inspection of its books and records. Accompanying Sandpiper's original answer was a counterclaim for a declaratory judgment that it acted in accordance with the declarations and bylaws of the Sandpiper Condominium community and for attorney's fees. On August 14, 2006, the trial court granted Shioleno leave of court to file special exceptions. Shioleno filed its special exceptions with the trial court on September 15, 2006, alleging that Sandpiper's counterclaim for declaratory relief was impermissible because it was brought solely to pave the way for attorney's fees. Shioleno asserted that the Declaratory Judgment Act is not available to settle disputes already before the trial court and that Sandpiper's counterclaim addresses the same issues brought forth by Shioleno in its petition for writ of mandamus.[8]

After a bench trial, the trial court denied Shioleno's petition for writ of mandamus and granted Sandpiper's counterclaim on April 20, 2007. In doing so, the trial court recited the following findings in its judgment: (1) the trial court had personal and subject matter jurisdiction over the parties and claims; (2) Sandpiper fully complied with its bylaws, the Texas Uniform Condominium Act, *see* TEX. PROP. CODE ANN. § 82.114 (Vernon 2007), and

---

[7] At trial, Shioleno argued that it was entitled to attorney's fees under section 82.161(a) of the property code rather than section 3.152 of the business organizations code or article 2.44(D) of the Texas Business Corporations Act, both of which the parties agreed were inapplicable given Sandpiper's non-profit status. *See Burton v. Cravey*, 759 S.W.2d 160, 162 (Tex. App.–Houston [1st Dist.] 1988, no writ); *see also* TEX. BUS. CORP. ACT ANN. art. 9.14(A) (Vernon Supp. 2007); TEX. PROP. CODE ANN. § 82.161(a) (Vernon 2007) ("The prevailing party in an action to enforce the declaration, bylaws, or rules is entitled to reasonable attorney's fees and costs of litigation from the nonprevailing party."). The record reflects that Shioleno did not plead for section 82.161 attorney's fees in its petition for writ of mandamus. *See* TEX. PROP. CODE ANN. § 82.161(a). However, the trial court allowed (1) Shioleno to amend its pleadings and (2) Barbieri to testify as to the issue of attorney's fees. The record contains a brief filed by Shioleno in support of its petition for writ of mandamus whereby Shioleno specifically noted that section 82.161 provides for attorney's fees in the event that it is the prevailing party. On appeal, Shioleno does not address its entitlement to attorney's fees. Instead, Shioleno merely attacks the propriety of the trial court's awarding of attorney's fees to Sandpiper.

[8] It is undisputed that Shioleno's special exceptions were denied by the trial court.

5

the Texas Non-Profit Corporation Act "in the timeliness and the manner in which it made the records of its affairs available for inspection by SHIOLENO," *see* TEX. REV. CIV. STAT. ANN. art. 1396-2.23 (Vernon 2003); (3) that Shioleno may inspect "further records or computers used by Sandpiper in its operations," but it must reimburse CCMS at the rate of $50.00 per hour for the time of CCMS's bookkeeper and at the rate of $80.00 per hour for CCMS's personnel to assemble the records and attend the inspection; and (4) Sandpiper was entitled to $10,759.00 in attorney's fees based on its declaratory judgment action. Shioleno filed its notice of appeal on May 18, 2007. This appeal ensued.

## II. ANALYSIS

### A. Shioleno's Petition for Writ of Mandamus to Enforce Inspection Rights

By its first issue, Shioleno contends that a trial court may not refuse to issue a writ of mandamus permitting a non-profit association member to inspect the association's books and records once the member has shown its entitlement to inspect such materials and its requests to do so have been denied. Shioleno also argues that it proved a proper purpose for the inspection and that Sandpiper failed to negate Shioleno's proper purpose. Conversely, Sandpiper argues that Shioleno failed to establish that it was entitled to mandamus relief because it failed to show that it did not already obtain all relief to which it was properly entitled. In addition, Sandpiper notes that Shioleno waived its entitlement to Sandpiper's Forms 1099 at trial.

#### 1. Applicable Law

A writ of mandamus filed in the trial court is the proper remedy to enforce a statutory right of inspection. *Burton v. Cravey*, 759 S.W.2d 160, 161 (Tex. App.–Houston [1st Dist.]

6

1988, no writ), *disapproved on other grounds by Huie v. DeShazo*, 922 S.W.2d 920, 924 (Tex. 1996);[9] *see Uvalde v. Rock Asphalt Co. v. Loughridge*, 425 S.W.2d 818, 820 (Tex. 1968) ("A method for the enforcement of the right of inspection or examination of the books and records of a corporation is by mandamus."). Shioleno did not have to establish an independent cause of action; it merely had to establish its statutory right to inspect. *Id.*

The Texas Non-Profit Corporation Act provides that a non-profit corporation must keep "correct and complete books and records of account," and a member of that non-profit corporation has the right "on written demand stating the purpose of the demand . . . at any reasonable time, for any proper purpose" to examine and copy those books and records relevant to that purpose, at the member's expense. TEX. REV. CIV. STAT. ANN. art. 1396-2.23. "The right to inspect under article 1396-2.23 encompasses *all* books and records." *Burton*, 759 S.W.2d at 162 (emphasis added) (internal quotations omitted). Additionally, the Texas Uniform Condominium Act provides, in relevant part, that:

> (a) The association shall keep:
>
> > (1) detailed financial records that comply with generally accepted accounting principles and that are sufficiently detailed to enable the association to prepare a resale certificate under Section 82.157;
> >
> > . . . .
> >
> > (b) *All financial and other records of the association shall be*

---

[9] On appeal, Sandpiper contends that Shioleno erroneously relies on *Burton*, 759 S.W.2d at 161, a case "discredited" by the Texas Supreme Court in *Huie v. DeShazo*, 922 S.W.2d 920, 924 (Tex. 1996). However, Sandpiper's contention is not entirely accurate. In *Huie*, the supreme court concluded that "to the extent that the court held that the owners' statutory right of inspection somehow trumped the privilege for confidential attorney-client communications, we disapprove of its holding . . . . We also disapprove of the court's dicta that the trial court could, in its discretion, decline to apply the attorney-client privilege even if all the elements of Rule 503 were met." 922 S.W.2d at 924. Therefore, the *Huie* court merely disapproved of the *Burton* decision with respect to an owner's request to inspect attorney records as part of the association's records. *Id.*

7

*reasonably available at its registered office or its principal office in this state for examination by a unit owner and the owner's agents.* An attorney's files and records relating to the association are not records of the association and are not subject to inspection by unit owners or production in a legal proceeding.

TEX. PROP. CODE ANN. § 82.114 (emphasis added).

The right of condominium owners to inspect the books and records is only limited by the requirement that the inspection be for any proper purpose. *Burton*, 759 S.W.2d at 162. Once Shioleno proved a proper purpose for the inspection, the burden shifted to Sandpiper to prove that Shioleno's inspection request was for an improper purpose. *See id.* (citing *Uvalde Rock Asphalt Co.*, 425 S.W.2d at 820; *Moore v. Rock Creek Oil Corp.*, 59 S.W.2d 815, 817 (Tex. Comm'n App. 1933, holding approved); 5A FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2253.1 (1987)).

**2. Discussion[10]**

**a. Shioleno's Written Requests to Inspect Sandpiper's Books and Records**

Sandpaper's bylaws echo the statutory provisions requiring Sandpiper to make its books and records available to owners. *See* TEX. REV. CIV. STAT. ANN. art. 1396-2.23; TEX. PROP. CODE ANN. § 82.114. Specifically, section 3.11 of the Sandpiper's bylaws provides that:

The Board of Directors shall keep or cause to be kept sufficient books and records with a detailed account of the receipts and expenditures of the Council. Such books and records must comply with good accounting procedures and must be audited at least once each year by an auditor who

---

[10] In its petition for writ of mandamus, Shioleno contended that it was entitled to Forms 1099 that Sandpiper had in its records. However, on appeal, Shioleno states that "[t]he sole exception to the records sought through mandamus but not produced is [the] 1099s relating to other owners which, as discussed herein, are no longer in controversy."

8

is not associated with the Project. *The books, records and papers of the Council shall at all times during reasonable business hours be subject to inspection by any Member of the Council.*

(Emphasis added.)

Shioleno first requested to inspect Sandpiper's books and records on February 2, 2006, stating that the purpose of the inspection was to expose accounting irregularities, poor management practices, and the mishandling of various reserve funds by Sandpiper that had "possible negative tax and financial ramifications reaching all Sandpiper Condo Owners." This request was sent to Crawford, and Barbieri testified at trial that he did not receive a response. On March 27, 2006, Gosman sent an e-mail to Triplett requesting that Sandpiper's books and records be made available for inspection. In this e-mail, Gosman listed fifteen items of particular importance to the inspection, yet he specifically noted the following: "[p]lease understand that the above list of items may not be all-inclusive, as additional information and documents may become needed during the course of our procedures." Gosman testified at trial that he includes this language in every inspection request he makes because he is unsure of what information will be provided. However, Gosman noted that, in this case, he requested a detailed general ledger, among other things, "in order to truly understand the transactions that had been reported . . . ."

At the time these requests were sent, it is undisputed that Shioleno was a member of the Sandpiper Condominium community for at least six months, and he was a director on Sandpiper's board of directors.[11] In its petition for writ of mandamus, Shioleno stated that the purpose for the inspection was "related to his interests as a director of the

---

[11] At trial, Shioleno testified that he currently owned two units in the Sandpiper Condominium community and that he had previously owned two additional units in the community.

9

corporation whose function it is to examine corporate circumstances and evaluate actions proposed by the board of directors." Additionally, Shioleno testified at trial that the reason he invoked his inspection rights was that he "became concerned about certain ways that accounting was being performed at the Sandpiper." Shioleno also testified that in his role as a Sandpiper director, he observed that "the quality of life wasn't improved [for individual condo owners] and expenses went up."

In its first amended original answer and counterclaim, Sandpiper merely stated that Shioleno failed to satisfy the conditions precedent—i.e., establishing a proper purpose—for its request for inspection. However, Sandpiper did not provide any evidence to support its conclusory statement that Shioleno had failed to establish a proper purpose. In fact, on appeal, Sandpiper does not contest Shioleno's purpose for initiating the inspection. Based on our review of the record, we conclude that Shioleno provided the requisite written demand accompanied by a statement indicating a proper purpose. *See* TEX. REV. CIV. STAT. ANN. art. 1396-2.23; *see also Burton*, 759 S.W.2d at 162. Moreover, we find that Sandpiper failed to prove that Shioleno had an improper purpose for requesting to inspect its books and records. *See Burton*, 759 S.W.2d at 162.

### b. Sandpiper's Denial of Shioleno's Inspection Rights and Its Attempts to Comply with Shioleno's Subsequent Requests

Shioleno alleges and the record appears to suggest that: (1) Sandpiper repeatedly denied him access to its books and records apparently maintained at its principal office in Corpus Christi; and (2) Sandpiper continually provided incomplete information as to the financial health of the association as required by statute and by its bylaws. Shioleno

testified that Sandpiper still had not provided all the books and records referenced in the February 2, 2006 and March 27, 2006 requests. Gosman received 2,900 pages of a general ledger in electronic form on March 28, 2006; he received an additional 465 pages of board minutes on March 30, 2006; and he received Sandpiper's tax returns and the management contracts between CCMS and Sandpiper on April 6, 2006. However, Gosman testified that he did not receive depreciation registers from Sandpiper until the week of the August 14, 2006 trial. Gosman further testified to the following:

Q: [Shioleno's counsel]: Had you had access to the books and records and the computer files when you were down here [Corpus], would it have been necessary for a work effort, I'll call it, by CCMS to gather this stuff and copy it and give it to you?

A: [Gosman]: Well, no. That was the basis for my being here, was to ease the effort to produce this information. If the information is right there in a file cabinet, then it's very simple to say, "Well, the information is right there." "If you want copies, fine. We'll make you copies, you can make copies, but the information is right there." See, the books and records that we asked for are what's kept in the normal course of business. It's nothing that needs to be newly created or pulled out of the ether [sic]. I mean, it's the books and records that they have to have to run their own business for their own financial reporting. So we aren't asking them to create anything, we were just simply asking access to what they already had.

Q: And I believe you testified before that you were denied that access?

A: In part, yes.

Q: All right.

11

A:                                    I am the first one to agree we got a lot of information, but there were some really important parts left out.

Barbieri testified that he sent an e-mail on April 21, 2006, to John Holmgreen, Sandpiper's trial counsel, as a last attempt to enforce Shioleno's inspection rights, requesting that Sandpiper make the remaining books and records available for inspection. Barbieri noted in the e-mail that he and Shioleno were in Corpus Christi from April 21 to 22 and that they could easily stop by Sandpiper's principal office and conduct the inspection of the remaining books and records. On April 22, 2006, Holmgreen sent an e-mail to Barbieri granting access to Sandpiper's remaining books and records and computer files on Sunday, April 23.[12] Holmgreen also noted that Shioleno could inspect Sandpiper's computer systems on Saturday, April 22, at 10:00 p.m. However, Barbieri and Shioleno were not able to inspect the records on these dates because they were scheduled to leave Corpus Christi prior to 10:00 p.m. on April 22, as Barbieri had stated in his e-mail to Holmgreen.

Then, on June 15, 2006, Holmgreen sent Barbieri another letter noting that Sandpiper had granted Shioleno access to the remaining books and records and computer systems from "Monday, June 19, 2006, and continuing until Friday, June 23, 2006, from 8:30 a.m. until 5:00 p.m." Holmgreen further noted that "[t]he records to which this response applies are the records described in ¶ 15 of Mr. Gosman's communication of

---

[12] In his April 22, 2006 e-mail, Holmgreen noted the following, in relevant part: "Tony—Sorry I missed your departure during the second (rental) meeting this afternoon. If Mr. Shioleno still wishes to take advantage of being here to inspect records and computer systems, as I described this morning, please call me . . . . CCMS can make its offices available for this tomorrow (Sunday) [April 23, 2006]. Respectfully, John Holmgreen."

March 27, 2006, and ¶ ¶ 7, 8, and 12 of your letter of April 21, 2006," indicating that Sandpiper still had not complied with Shioleno's initial requests for inspection of its books and records.

Sandpiper relies heavily on an e-mail sent by Barbieri to Holmgreen on August 10, 2006, stating that the parties should arrange to inspect the computers and computer files at Sandpiper and CCMS after the bench trial on August 14, 2006. Sandpiper argues that this statement confirms "*yet another* of Appellee's *repeated* offers, prior to the hearing, to have Appellants inspect its computer systems." (Emphasis in original.) On appeal, Sandpiper notes that on three separate occasions, Shioleno was granted access to inspect its books and records: April 22, June 15, and August 10.

While it appears Sandpiper tried to accommodate Shioleno's schedule, in the end, according to Barbieri's August 10, 2006 e-mail, Sandpiper still had not produced much of the requested information, including: (1) backup or supporting information for the previously supplied general ledger entries; (2) fixed asset and depreciation registers for all activity between September 30, 2002, and September 30, 2005; (3) all contracts and agreements involving Sandpiper and the services of any employee, contractor, or company from October 2003 to August 2006; (4) all correspondence between Sandpiper board members other than the minutes of the board of directors meetings; (5) all correspondence between Ron Park and Sandpiper from October 2003 to August 2006;[13] and (6) all work papers provided for the audit of Sandpiper, including the Resort Fund, from September 30,

---

[13] Sandpiper argued at trial and now argues on appeal that it attempted to procure records from Ron Park, but he refused to turn over any documents. Park claimed that the documents in his possession were work product and were, thus, privileged. As a result, the Park papers have not been made available for inspection by Shioleno. The propriety of Park's claim of privilege is not within the scope of this appeal.

2003 through September 30, 2005.

Based on the foregoing, we conclude that Sandpiper failed to comply with section 82.114 of the property code, article 1396-2.23, and section 3.11 of its own bylaws in making its books and records available to Shioleno at a reasonable time after Shioleno's initial request for inspection. *See* TEX. REV. CIV. STAT. ANN. art. 1396-2.23; TEX. PROP. CODE ANN. § 82.114. Shioleno was entitled to personally inspect Sandpiper's books and records upon his first written request stating a proper purpose. *See* TEX. REV. CIV. STAT. ANN. art. 1396-2.23; *see also Burton*, 759 S.W.2d at 162 (noting that "[t]he right to inspection under article 1396-2.23 encompasses *all books and records*") (internal quotations omitted) (emphasis added). We believe that the legislature's intent in granting owners inspection rights of the books and records of a non-profit corporation was "to provide owners with ready access to the books and records of their condominium and the most logical place for keeping these records is on the premises." *Bd. of Directors of By the Sea Council of Co-Owners, Inc. v. Sondock*, 644 S.W.2d 774, 782 (Tex. App.–Corpus Christi 1982, writ ref'd n.r.e). Furthermore, it does not appear that Sandpiper was authorized to deny Shioleno access to its books and records given that Shioleno had stated a proper purpose for the inspection.[14] *See* TEX. REV. CIV. STAT. ANN. art. 1396-2.23; TEX. PROP. CODE ANN. § 82.114; *see also Burton*, 759 S.W.2d at 162.

We do not find Sandpiper's grants of access to its books and records on April 22, June 15, and August 10, in keeping with the legislature's intent. *See* TEX. REV. CIV. STAT.

---

[14] Sandpaper was entitled to raise a fact issue over whether Shioleno had a proper purpose for wanting to see the books, but it failed to do so. *See Uvalde Rock Asphalt Co. v. Loughridge*, 425 S.W.2d 818, 820 (Tex. 1968).

ANN. art. 1396-2.23; TEX. PROP. CODE ANN. § 82.114; *see also Burton*, 759 S.W.2d at 162; *Sondock*, 644 S.W.2d at 782.  In particular, Sandpiper's grant of access to its books and records on April 22—the day that Barbieri stated to Holmgreen that he and Shioleno had to leave Corpus Christi—at 10:00 p.m. can hardly be construed as reasonable given that its bylaws require that inspections transpire "during reasonable business hours . . . ."  Moreover, we do not find Sandpiper's grant of access to its books and records on June 15 and August 10, after several additional requests were made by Shioleno and more than four months after Shioleno's initial request to inspect Sandpiper's books and records, to be reasonable.

It is unclear to this Court why Sandpiper did not acquiesce to Shioleno's initial written demands for inspection until more than four months had elapsed if the books and records were, indeed, kept at the Corpus Christi office as required.  *See* TEX. REV. CIV. STAT. ANN. art. 1396-2.23; TEX. PROP. CODE ANN. § 82.114.  Because Shioleno was not permitted access to Sandpiper's books and records at Sandpiper's Corpus Christi office at a reasonable time after Shioleno made his initial request stating a proper purpose for inspection and because Sandpiper still has not produced all of the relevant documents requested,[15] we conclude that Sandpiper has not complied with the Texas Non-Profit Corporation Act, the Texas Uniform Condominium Act, and its own bylaws.  *See* TEX. REV. CIV. STAT. ANN. art. 1396-2.23; TEX. PROP. CODE ANN. § 82.114.  Accordingly, we sustain Shioleno's first issue on appeal.

---

[15] In fact, at the hearing on the motion to enter judgment, Sandpiper's counsel acknowledged they were prepared to provide Shioleno access to the computers and the "backup and supporting information" that had been requested.  Thus, by Sandpiper's own admission, it has not fully complied with Shioleno's requests.

**B. Sandpiper's Counterclaim for Declaratory Relief and Attorney's Fees**

By its second, third, and sixth issues, Shioleno asserts that Sandpiper's counterclaim for declaratory relief was impermissible because it raised the same issues of compliance with the association's governing documents as were addressed in Shioleno's petition for writ of mandamus. Specifically, Shioleno argues that Sandpiper cannot bring a counterclaim under the Texas Declaratory Judgment Act ("DJA") where the counterclaim merely re-asserts a party's affirmative defense to the underlying suit. In addition, Shioleno argues that the trial court abused its discretion in awarding Sandpiper attorney's fees because Sandpiper was not the "prevailing party." Sandpiper, on the other hand, contends that Shioleno failed to preserve this issue for appeal. In addition, Sandpiper argues that its counterclaim, though related to Shioleno's original claim, sought "affirmative relief concerning the ongoing relationship between the parties," thereby making its counterclaim permissible.

**1. Applicable Law**

Declaratory judgments are reviewed under the same standards as all other judgments. TEX. CIV. PRAC. & REM. CODE ANN. § 37.010 (Vernon 1997); *In re Estate of Schiwetz*, 102 S.W.3d 355, 365 (Tex. App.–Corpus Christi 2003, no pet.). We look to the procedure used to resolve the issue at trial to determine the standard of review on appeal. *Guthery v. Taylor*, 112 S.W.3d 715, 720 (Tex. App.–Houston [14th Dist.] 2003, no pet.); *Roberts v. Squyres*, 4 S.W.3d 485, 488 (Tex. App.–Beaumont 1999, pet. denied). The trial court's conclusion, being one of law, will be upheld on appeal if it can be sustained on any legal theory supported by the evidence. *See Alma Invs., Inc. v. Bahia Mar Co-Owners*

16

*Ass'n*, 999 S.W.2d 820, 823 (Tex. App.–Corpus Christi 1999, pet. denied).

Section 37.004 of the civil practice and remedies code provides:

(a) A person[16] interested under a deed, will, written contract, or other writing constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (Vernon 1997). Moreover, section 37.002 states that chapter 37 of the civil practice and remedies code is intended to be remedial in nature and "its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." *Id.* § 37.002(b) (Vernon 1997).

However, declaratory relief is not available to settle a dispute that is currently pending before a court. *BHP Petroleum Co., Inc. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990) (orig. proceeding); *Staff Ind., Inc. v. Hallmark Contracting, Inc.*, 846 S.W.2d 542, 547-48 (Tex. App.–Corpus Christi 1993, no writ); *John Chezik Buick v. Friendly Chevrolet*, 749 S.W.2d 591, 594 (Tex. App.–Dallas 1988, writ denied) (concluding that a declaratory judgment counterclaim was not properly brought because the issue raised by the defendant was already before the court as part of the plaintiff's case). Furthermore, a defendant cannot institute a cross-action for declaratory relief if the cross-action fails to present a justiciable controversy separate from the underlying suit. *See Hitchcock Props., Inc. v. Levering*, 776 S.W.2d 236, 239 (Tex. App.–Houston [1st Dist.] 1989, writ denied);

---

[16] Section 37.001 of the civil practice and remedies code provides that a "person" is "an individual, partnership, joint-stock company, unincorporated association or society, or municipal or other corporation of any character." TEX. CIV. PRAC. & REM. CODE ANN. § 37.001 (Vernon 1997).

*see also Narisi v. Legend Diversified Invs.*, 715 S.W.2d 49, 51-52 (Tex. App.–Dallas 1986, writ ref'd n.r.e.) (holding that a counterclaim brought under the DJA that presents no new controversies, but is engineered solely to pave an avenue for an award of attorney's fees, is not proper).

### 2. Discussion

We first address Sandpiper's contention that Shioleno failed to preserve this issue for appellate review.[17] To preserve a complaint for appellate review, the complaining party must present the complaint to the trial court with sufficient specificity to make the trial court aware of the complaint. TEX. R. APP. P. 33.1(a). In its special exceptions, Shioleno claimed that Sandpiper's declaratory judgment action was impermissible because it addressed the same issues raised in Shioleno's petition for writ of mandamus in order to pave the way for attorney's fees. Given that Shioleno raised this contention with the trial court in its special exceptions, we conclude that Shioleno has preserved this issue for appellate review. *See id.*

In its counterclaim for declaratory relief, Sandpiper sought "a declaration . . . that the Council acted in accordance with the Declaration and Bylaws of the Sandpiper Condominium and for the Council's attorneys' [sic] fees." In support of its counterclaim, Sandpiper argued that it had produced the records Shioleno had requested, that Shioleno

---

[17] Sandpiper argues that special exceptions are pleas and that Shioleno was not permitted to submit its special exceptions on the day of trial. Specifically, Sandpiper notes that for pleadings filed within seven days of trial, leave of court must be obtained. Rule 63 of the Texas Rules of Civil Procedure states that leave of court "shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party." TEX. R. CIV. P. 63. The record reflects, and Sandpiper admits in its response to Shioleno's special exceptions, that the trial court granted Shioleno leave to file its special exceptions to Sandpiper's declaratory judgment action. *See* TEX. PROP. CODE ANN. § 82.161. Therefore, we consider Shioleno's special exceptions to have been properly filed and considered by the trial court.

had failed to satisfy the conditions precedent to its request for inspection, and that the purpose of the inspection was improper. Essentially, these contentions are at the crux of Shioleno's action for mandamus relief. It is clear to this Court that the contentions made in Sandpiper's counterclaim for declaratory relief—Sandpiper's compliance with its declarations and bylaws—were already in dispute as a part of Shioleno's case and that Sandpiper's counterclaim was brought for the purpose of obtaining attorney's fees under the DJA. *See BHP Petroleum Co., Inc.*, 800 S.W.2d at 841; *Narisi*, 715 S.W.2d at 51-52.

Sandpiper relies on the holdings in *BHP Petroleum*, 800 S.W.2d at 841-82 and *Placid Oil Co. v. Louisiana Gas Intrastate, Inc.*, 734 S.W.2d 1, 5-6 (Tex. App.–Dallas 1987, writ ref'd n.r.e) to support its contention that its counterclaim for declaratory relief brought forth a justiciable controversy because of the ongoing nature of the relationship between the parties. Sandpiper further alleges that these cases support its contention that the trial court did not err in awarding it attorney's fees. We disagree.

In *BHP Petroleum*, the Texas Supreme Court concluded that when a "declaratory judgment counterclaim ha[s] greater ramifications than the original suit," the court may allow the counterclaim. 800 S.W.2d at 842. BHP Petroleum ("BHP"), a producer and seller of natural gas, brought suit in Harris County against ANR Pipeline Company ("ANR"), an entity engaged in the purchasing, transporting, and selling of natural gas, for various breaches of contract. *Id.* at 839. ANR filed an original answer and counterclaim for declaratory relief asserting, among other things, "that revolutionary changes in the interstate natural gas industry have combined to excuse ANR's customers from obligation to gas from ANR . . . ." *Id.* at 839 & n.4. The supreme court noted that "BHP's suit is

essentially one for breach of the 'take-or-pay' obligation of the gas purchase contract and 'consequential damages' and requested relief for underpayment for ANR's alleged failure to purchase or pay for specific quantities of BHP's gas . . . ." *Id.* at 842. The supreme court further noted that "ANR's counterclaim sought an interpretation of the gas purchase contract which would have the effect of defining the obligations of the parties under the contract for the foreseeable future." *Id.* Based on the uncertainty created by changing industry conditions, the supreme court concluded that the ANR's counterclaim had greater ramifications than BHP's original suit and, therefore, allowed the counterclaim to remain. *Id.*

Here, Sandpiper's counterclaim does not have greater ramifications than the underlying suit instituted by Shioleno. In fact, Sandpiper stated in its first amended original answer and counterclaim that it "asserts a counterclaim against Anthony J. Shioleno and SRI Properties, Inc., counterdefendants, for a declaration . . . that the Council has acted in accordance with the Declaration and Bylaws of the Sandpiper Condominium and for the Council's attorneys' [sic] fees." Unlike ANR in *BHP Petroleum*, Sandpiper certainly has not alleged that extraordinary circumstances have arisen that would govern the obligations of the parties in the foreseeable future. *See id.* at 839, 842 & n.4. Instead, the issues raised in Sandpiper's counterclaim are precisely the issues that are disputed in Shioleno's suit.

In *Placid Oil*, appellant brought a breach of contract claim against appellee, Louisiana Gas Intrastate, Inc. ("LGI"), pertaining to a gas sales contract. 734 S.W.2d at 2. Specifically, Placid Oil contended that LGI had underpaid for gas sold under the

contract. *Id.* LGI counterclaimed, seeking declaratory relief and attorney's fees. *Id.* LGI's counterclaim sought a declaration of rights, status, and legal relations under the gas purchase contract with Placid Oil. *Id.* The trial court rendered judgment for LGI on its counterclaims and rendered a take-nothing judgment against Placid Oil. *Id.* The Dallas Court of Appeals affirmed the judgment of the trial court and concluded, among other things, that the trial court did not abuse its discretion in awarding LGI attorney's fees based upon its counterclaim for declaratory judgment. *Id.* at 5-6. The court specifically noted that the "[DJA] gave the trial court discretion to award attorney's fees." *Id.* at 5.

Unlike here, the court in *Placid Oil* concluded that LGI had complied with the underlying contract. *Id.* at 3-5. In fact, the *Placid Oil* court was faced with issues pertaining to choice of law —whether Texas or Louisiana law applied—and the definition of industry-specific terms governing the gas sales contract. *Id.* Furthermore, Placid Oil did not appeal the propriety of LGI's counterclaim with respect to justiciability. As a result, the *Placid Oil* court did not address the justiciability of LGI's counterclaim for declaratory relief. In awarding LGI attorney's fees, the Dallas Court of Appeals relied solely on the fact that the DJA provides that a trial court may award attorney's fees in its discretion. *See id.* Based on the foregoing, we do not find the holdings in *BHP Petroleum* and *Placid Oil* to be persuasive in this matter. We therefore conclude that Sandpiper, in its counterclaim, failed to present a justiciable controversy apart from Shioleno's suit. *See Hitchcock Props., Inc.*, 776 S.W.2d at 239; *see also Narisi*, 715 S.W.2d at 51-52.

With respect to attorney's fees, the DJA allows the trial court to award reasonable and necessary attorney's fees that the court considers to be equitable and just. TEX. CIV.

21

PRAC. & REM. CODE ANN. § 37.009 (Vernon 1997). However, the award of attorney's fees under the DJA is a matter of discretion. *Roberson v. City of Austin*, 157 S.W.3d 130, 137 (Tex. App.–Austin 2005, pet. denied). "A prevailing party in a declaratory judgment action is not entitled to attorney's fees simply as a matter of law; entitlement depends on what is equitable and just and the trial judges' power is in that respect discretionary." *Id.* (quoting *Unified Loans v. Pettijohn*, 955 S.W.2d 649, 654 (Tex. App.–Austin 1997, no pet.)). In this case, the trial court award Sandpiper $10,759.00 in attorney's fees based upon its conclusion that Sandpiper had brought a viable counterclaim for declaratory relief. Because Sandpiper's counterclaim failed to present a justiciable controversy apart from Shioleno's suit, we conclude that the trial court abused its discretion in awarding Sandpiper attorney's fees. Accordingly, we sustain Shioleno's second, third, and sixth issues on appeal.

## C. Financial Obligations and the Right to Inspect a Non-Profit Corporation's Books and Records

By its fifth issue, Shioleno argues that financial obligations cannot be imposed upon a member requesting to inspect records of a condominium association under either the Texas Uniform Condominium Act or the association's bylaws. Shioleno also argues on appeal that the trial court did not have subject matter jurisdiction over inspection fees because this issue was neither before the trial court nor was a justiciable controversy that the trial court could resolve.

The Texas Non-Profit Corporation Act provides for examination and copying of books and records, at the member's expense. TEX. REV. CIV. STAT. ANN. art. 1396-2.23.

Shioleno argues it did not seek relief under the Texas Non-Profit Corporation Act, rather based its right of inspection on the association's bylaws and the Texas Uniform Condominium Act, neither of which provide for costs of examination. Nonetheless, the Texas Non-Profit Corporation Act clearly applies to this dispute, and the trial court was entitled to consider it in its judgment. *See id.*; *see also KB Home v. Employers Mut. Cas. Co.*, No. 2-06-383-CV, 2008 Tex. App. LEXIS 771, at *16 (Tex. App.–Fort Worth Jan. 31, 2008, no pet.) (noting that "it is axiomatic that artful pleading cannot change the character of a lawsuit. In the vernacular, calling a duck a chicken does not make it so"); *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 742 (Tex. App.–Fort Worth 2005, no pet.) ("A plaintiff by artful pleading cannot recast a claim in order to avoid the adverse effect of a statute."); *Alma Group, L.L.C. v. Palmer*, 143 S.W.3d 840, 843-44 (Tex. App.–Corpus Christi 2004, pet. denied) (stating, among other things, that a trial court has no discretion in deciding the law or its proper application).

Prior to entry of judgment, Shioleno's counsel stipulated to payment of reasonable administrative expenses. Specifically, Shioleno's counsel noted the following:

> And let me clarify something, Your Honor. Mr. Shioleno is willing to pay for—if somebody from the Sandpiper, or CCMS, needs to have some administrator or somebody spend time showing Mr. Gosman these books and records, we will be more than happy to reimburse them for those expenses, but we don't feel we should have to pay for any unnecessary expenses; i.e. copying of documents, where there's no need to copy documents; i.e., paying for attorney's fees when there's no reason—there was no reason for us to even have to file a suit if they would have complied with their obligations to begin with.

This stipulation coupled with the evidence at trial provides ample support for the trial court's

judgment.[18]

Accordingly, we overrule Shioleno's fifth issue.

### III. CONCLUSION

We reverse the judgment of the trial court and remand for proceedings consistent with this opinion with respect to Shioleno's inspection rights and Sandpiper's declaratory judgment action. However, we affirm the trial court's award of reasonable administrative expenses. We need not address Shioleno's fourth issue on appeal given that we have concluded that Sandpiper's counterclaim did not present a justiciable controversy. *See* TEX. R. APP. P. 47.1.

_____
DORI CONTRERAS GARZA,
Justice

Memorandum Opinion delivered and
filed this the 17th day of July, 2008.

---

[18] Specifically, Crawford testified that it would take two to three days to assemble Sandpiper's records and that the hourly rate for Kathy Vanna, CCMS's bookkeeper, was $50.00 and his hourly rate for overseeing the inspection was $80.00.